FILED

2025 JAN -6 PM 3:51

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF
SANTA ANA

BY____PD____

JESUS ERIC CARASCO, PRO SE
Register No.: 26019-112
Metropolitan Detention Center
80 29th Street
Brooklyn, NY 11232

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,


Vs.

JESUS ERIC CARASCO,

    Defendant

CASE NO.:  8:19-CR-00169-JVS

**RESPONSE TO GOVERNMENT'S OPPOSITION TO RULE 33 MOTION AND MOTIONS TO COMPEL *BRADY***

# Table of Contents

Table of Contents .......................................................................................................... 2

(I) Case Background ...................................................................................................... 3

(II) Suppression of Brady Material ............................................................................... 4

    1.   Introduction ..................................................................................................... 4

        *Timeliness* ...................................................................................................... 6

        *Materiality* ..................................................................................................... 8

    2.   Missing Probable Cause .................................................................................. 9

    3.   Internal Affairs Misconduct Finding ............................................................ 13

    4.   Misappropriated Narcotics ............................................................................ 16

    5.   Missing Cell Phones ..................................................................................... 22

    6.   Suppressed Confidential Informant ............................................................... 24

    7.   Suppressed Personnel Records ...................................................................... 28

    8.   Caracso's Identification ................................................................................ 31

    9.   Planted Louis Vuitton Receipts .................................................................... 34

    10.   Purported Confession .................................................................................. 35

(III) New Evidence ...................................................................................................... 40

(IV) Rule 33 ................................................................................................................ 42

    1.   Legal Standard .............................................................................................. 43

    2.   Materiality .................................................................................................... 46

    3.   Obstruction ................................................................................................... 47

(IV) Conclusion ........................................................................................................... 48

Certificate of Service .................................................................................................. 50

Exhibits ....................................................................................................................... 51

    Exhibit A ............................................................................................................ 52

        *ASJ emails* ...................................................................................................... 52

    Exhibit B ............................................................................................................ 53

        *ER 1368, 1442* ............................................................................................... 53

    Exhibit C ............................................................................................................ 54

        *8:22:cv-00755-JVS Dkt 3 at 24-26 (Barton emails on cell phones)* ............. 54

        *7/4/2024 email from Mr. Carasco to prosecution* ......................................... 54

    Exhibit D ............................................................................................................ 55

        *Dkt 197 at 6-10, 12-13 (4/23/2020, 6/2/2020, 6/23/2020, 6/25/2020)* .......... 55

# Case Law

## Cases

*Alcorta v. Texas,* 355 U.S. 28 1957 ...................................................................................19

*Banks v. Dretke,* 540 U.S. 668, 696, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 2004 ...................8

*Belmontes v. Brown,* 414 F.3d 1094, 1115 9th Cir. 2005 .....................................................33

*Broam v. Bogan,* 320 F.3d 1023, 1030 9th Cir. 2003 ............................................................8

*Carriger v. Steward,* 132 F. 3d 436, 480 9th Cir. 1997 .......................................................16

*Carrillo v. County of Los Angeles,* 798 F. 3d 1210, 1219 9th Cir. 2015 ...............................16

*Gallego v. United States,* 276 F .2d 914, 917 (9th Cir. 1960) ...............................................15

*Hayes v. Brown,* 339 F.3d 972, 984 (9th Cir. 2005) (en banc) ...............................................32

*Imbler v. Pachtman,* 424 U.S. 409, 427 n. 25 1976 ..............................................................4

*Kyles v. Whitley,* 514 U.S. 419, 437-38 1995 ........................................................................5

*La Buy v. Howes Lether Co.,* 352 U.S. 249, 259-260, 77 S. Ct. 309, 1 L. Ed 2d 290 1956 ....49

*Lego . Twomey,* 404 U.S. 477, 479, n.1, 92 S. Ct. 619, 30 L. Ed 2d 618 1972 ......................49

*Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 129 S Ct 2527, 174 L Ed 2d 314, 2009 ......22

*Mellen v. Winn,* 900 F.3d 1085 (9th Cir. 2018) ....................................................................16

*Milke v. Ryan,* 711 F.3d 998 (9th Cir. 2013) .......................................................................36

*Morris v. Ylst,* 447 F.3d 735, 744 (9th Cir. 2006) ................................................................33

*N. Mariana Islands v. Bowie,* 243 F.3d 1109, 1122 (9th Cir. 2001 ........................................33

*Napue v. Illinois,* 360 U.S. 269, 79 S. Ct. 1173, 3 L. ed. 2d 1217 1964 ...............................28

*Pennsylvania v. Richie,* 480 U.S. 39, 59-60 ..........................................................................4

*Runningeagle v. Ryan,* 686 F.3d 758, 772 n.6 9th Cir. 2012 ...................................................4

*Smith v. Roberts,* 115 F.3d 818, 820 10th Cir. 1997 ..............................................................8

*Strickler v. Greene,* 527 U.S. 281, S. Ct. 1936 ....................................................................13

*Tennison v. City + City of S.F.,* 570 F. 3d 1078, 1088 9th Cir. 2009 .......................................8

*United States v. Alvarez,* 86 F.3d 901 9th Cir. 1996 ............................................................28

*United States v. Banks,* 383 F. Supp 389, 392 D.S.Dak 1974 ...............................................49

*United States v. Bryan,* 868 f.2d 1032, 1036 9th Cir.1989 .....................................................5

*United States v. Bundy,* 968 F.3d 1019; 9th Circuit 2020 ....................................................24

*United States v. Butler,* 567 F. 2d 885 9th Cir. 1978 .............................................................6

*United States v. Catton* (89 F.3d 387, 388 7th Cir. 1996) ....................................................19

*United States v. Dickerson,* 873 F.2d 1181, 1185 (9th Cir. 1988) .........................................15

*United States v. Durgin,* 444 F.2d 308 (9th Cir. 1971) .........................................................43

*United States v. Fisher,* 711 F.3d 460, 46 (4th Cir. 2013) ....................................................12

*United States v. Heath,* 260 F.2d 623, 632 9th Cir. 1958 ....................................................49

*United States v. Henthorn,* 931 F.2d 29 9th Cir. 1992 .........................................................28

United States v. Jesus Eric Carasco, 8:19-cr-00169-JVS ........................................................3

*United States v. Kellington,* 217 F.3d 1084, 1095 9th Cir 2000 ...........................................43

1    *United States v. Lucas,* 841 F.3d 796, 807 9th Cir. 2016 ..........................................4

2    *United States v. Orman,* 417 F. Supp 1126 D.Colo. 1976 ......................................49

3    *United States v. Polisi,* 416 F.2d 573 (2nd Cir. 1969) ...........................................43

4    *United States v. Santiago,* (46 F.3d 885, 893 9th Cir. 1995) ................................27

5    *United States v. Solorio,* 669 F.3d 943, 954 n.13 (9th Cir. 2012) .........................14

6    *United States v. Wood,* (57 F.3d 733 9th Cir. 1995) .............................................27

7    **Other Authorities**

8    *United States Constitution, Fourth Amendment* ...................................................8

9    *United States Constitution, Fifth Amendment* .......................................................8

10   *United States Constitution, Sixth Amendment* .......................................................8

1    **(I) Case Background**

2

3    San Bernardino Sherriff's Department ('SBSD') officers began investigating

4    Jesus Eric Carasco in February 2019.  Mr. Carasco was a guest at Mr. Gonzalez's

5    apartment in Anaheim, California (see Dkt 156 at 175-176); on April 15th, 2019 the

6    SBSD deputies raided that apartment.  They located cocaine, heroin, a firearm, and

7    cash in a safe located in the master bedroom's closet (Dkt 156 at 46-47).  Mr.

8    Carasco was arrested and charged in the Central District of California with

9    possession and intent to distribute those narcotics, and possession of a firearm in

10   furtherance of distributing those narcotics.

11   Mr. Carasco was convicted in a jury trial in October 2021 (*United States v.*

12   *Jesus Eric Carasco,* 8:19-cr-00169-JVS).  He appealed the verdict and sentence to

13   the 9th circuit, and on October 18th, 2024, the appellate court affirmed the verdict

14   (9th Circuit case #: 22-50038).  He has previously filed a motion under 28 U.S.C

15   2255.[1]

16   On January 17th, 2024, Mr. Carasco filed a currently pending 'Motion for a

17   New Trial under Rule 33' (Dkt 184, 188); he subsequently filed multiple *Brady*

18   motions (Dkt 189, 190, 194, 196, 197).  The Government responded to the filings

---

[1] The 2255 motion was denied "for lack of subject matter jurisdiction owing to Carasco's pending appeal" (8:22-cv-00755-JVS, "Order Regarding Motion for Reconsideration").

1  on December 11th, 2024 (Dkt 207); here Mr. Carasco responds to the

2  Government's opposition.

3

4  **(II) Suppression of Brady Material**

5

6  **1. Introduction**

7      The Government has a Constitutional obligation under the Due Process

8  Clause to disclose exculpatory and impeachment material to the defense under

9  *Brady*.   While "it is the government, not the defendant or the trial court that

10  decides *prospectively* what information, if any, is material and must be disclosed

11  under *Brady*" (*United States v. Lucas,* 841 F.3d 796, 807 9th Cir. 2016), if "the

12  defendant can point the court to exculpatory evidence which the government

13  withheld" or if the Court otherwise orders, the Government must produce the

14  requested material (*Pennsylvania v. Richie,* 480 U.S. 39, 59-60).    The

15  Government's primary *Brady* obligations extend until "a criminal conviction is

16  final on direct appeal" (*Runningeagle v. Ryan*, 686 F.3d 758, 772 n.6 9th Cir.

17  2012), although even beyond the direct appeal the Government must take action if

18  it discovers "information that casts doubt upon the correctness of the conviction"

19  (*Imbler v. Pachtman*, 424 U.S. 409, 427 n. 25 1976).   The obligation to disclose

20  includes evidence "known only to the police investigators and not to the

4

1    prosecutor" and "the individual prosecutor has a duty to learn of any favorable

2    evidence known to others acting on the government's behalf..., including the

3    police" (*Kyles v. Whitley,* 514 U.S. 419, 437-38 1995).  As a matter of law, the

4    prosecution is "deemed to have knowledge of and access to anything in the

5    possession, custody or control of any law enforcement agency participating in the

6    same investigation of the defendant" (*United States v. Bryan,* 868 f.2d 1032, 1036

7    9th Cir. 1989). (See Dkt 190 at 9-15).  Under *Brady* and *Giglio,* failing to disclose

8    material exculpatory or impeachment evidence violates a defendant's due-process

9    rights.   In order to secure a new trial, a defendant must establish that (1) the

10   undisclosed evidence was favorable to him; (2) it was material, i.e. caused

11   prejudice; and (3) the prosecution possessed the evidence, yet failed to disclose it.

12       In the instant case, the Government has systematically suppressed *Brady*

13   information; they suppressed the affidavit of probable cause for the Debra Harris

14   search warrant, suppressed both the existence of and payment to a confidential

15   informant, suppressed cell phones and the surveillance footage they contained,

16   misappropriated narcotics and money, and suppressed sustained findings by

17   Internal Affairs of serious misconduct against Mr. Carasco, as detailed in the

18   defense's *Brady* filings (Dkt 189, 190, 194, 196, 197) and as outlined below.  And

19   while many of these violations involved misconduct by the SBSD officers who

20   arrested Mr. Carasco and are in their possession, "since the investigative officers

1    are part of the prosecution, the taint on the trial is no less if they, rather than the

2    prosecutor, were guilty of nondisclosure" (*United States v. Butler,* 567 F. 2d 885

3    9th Cir. 1978).

4         The Government does not bother to engage with the merits of Mr. Carasco's

5    filings in their response (Dkt 207), with no substantive response at all to the pattern

6    of serious misconduct despite the defense raising those concerns repeatedly before,

7    during, and after trial. Instead, the Government attempted to re-frame this pattern

8    of serious *Brady* violations as purely post-trial speculation of the defense; but it is

9    neither.

10        In fact, the missing affidavit of probable cause for the search warrant plainly

11   violates Mr. Carasco's Fourth Amendment right for a search warrant to be issued

12   only "upon probable cause, supported by Oath or affirmation, and particularly

13   describing the place to be searched, and the persons or things to be seized."  The

14   Government's pattern of ignoring their *Brady* obligations violates Mr. Carasco's

15   Fifth Amendment right to due-process, and the resulting prejudice violates his right

16   to a fair trial under the Sixth Amendment.  The *Brady* violations were material, and

17   were raised, repeatedly, in a timely manner.

18        ***Timeliness***

19        The Government claims that Mr. Carasco's "motions to compel disclosures

20   are untimely" because "after a criminal conviction is final on direct appeal,

6

1   prosecutors have no further duty under *Brady*" (Dkt 207, citing to *Runningeagle v.*

2   *Ryan*).  But, as outlined below, the defense repeatedly asked for this information

3   *pre-trial*, and the Government failed to provide it.  The recent post-trial motions

4   show that the Government's pre-trial responses omitted material *Brady* information

5   and in some cases were actively false.  The defense's motions invited the

6   Government to rectify their omissions, but the Government made it clear it has no

7   interest in doing so, writing simply that it "has complied with [its] obligations in

8   this case" (Dkt 207).  Furthermore, Mr. Carasco's requests were made when he

9   was still on direct appeal (filed from 3/19/2024 through 8/19/2024), and thus even

10  *absent* the numerous pre-trial requests, the post-trial *Brady* motions were in fact

11  timely under *Runningeagle*.  And, while Mr. Carasco was still on direct appeal, the

12  Government made it clear it would not respond to the *Brady* requests (ASJ email

13  6/11/2024 6:21pm; Exhibit A).  The Government's argument fails; certainly the

14  Government cannot avoid timely *Brady* request by stonewalling until they run out

15  the clock.  "A prosecutor's decision not to preserve or turn over exculpatory

16  material before trial, during trial, or after conviction, is a violation of due-process

17  under *Brady*.  *Brady* requires disclosure of information that the prosecution

18  acquired during the trial itself, or even afterwards. The *Brady* duty to disclose is

19  ongoing and extends to all stages of the Judicial Process, where the evidence arose

20  after trial but during direct appeal." (*Tennison v. City + City of S.F.*, 570 F. 3d

1    1078, 1088 9th Cir. 2009; see also *Broam v. Bogan,* 320 F.3d 1023, 1030 9th Cir.

2    2003; *Smith v. Roberts,* 115 F.3d 818, 820 10th Cir. 1997.)  Indeed, "a rule…

3    declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system

4    constitutionally bound to accord defendants due process" (*Banks v. Dretke,* 540

5    U.S. 668, 696, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 2004).

6       As such, Mr. Carasco's various motions to compel production of *Brady* and

7    *Giglio* material are timely—*both* because they were raised pre-trial, and

8    *additionally* because the post-trial motions were while Mr. Carasco was still on

9    direct appeal.

10    ***Materiality***

11       Nor are Mr. Carasco's concerns mere speculation.  The Government

12    misleadingly cites to *Pennsylvania v. Richie*, writing that "*Brady* does not permit a

13    defendant to sift through information held by the government to determine

14    materiality….  Unless the defendant can point the court to exculpatory evidence

15    which the government withheld, the prosecutor's decision on disclosure is final."

16    But Mr. Carasco is not attempting to 'sift through information to determine

17    materiality'; as outlined below, he has already 'point[ed] the court to exculpatory

18    evidence which the government withheld.'  For instance, newly discovered

19    evidence confirms that his arresting officers could not plausibly have had a valid

20    search warrant with affidavit of probable cause, in violation of the

1    Fourth Amendment.  Many of the *Brady* violations in the instant case individually

2    "cast doubt upon the correctness of the conviction" (as in *Imbler v. Pachtman*), and

3    together they certainly do.  The appropriate way to remediate these serious

4    violations is to grant Mr. Carasco a new trial.

5    **Missing Probable Cause**

6    On April 15th, 2019, SBSD officers arrested Mr. Carasco and seized

7    narcotics that lead to his conviction.  But to this day, the government has failed to

8    provide a search warrant with an attached affidavit of probable cause.

9    The only actual search warrant provided by the Government was issued in

10   2020 by Judge Debra Harris (Bates 138):

WARRANT NOTES                                          VVSW 20-1275
(No Notes)

County of San Bernardino.

The people of the State of California to any peace officer in the County of San Bernardino.

Proof, by affidavit, having been this day made before me by telephone by the officer whose signature is affixed to the affidavit, that there is probable cause for believing that evidence tending to show that a felony (or felonies) has or have been committed, you are therefore commanded to make search on the person and/or property set forth in the description page and/or affidavit, which is incorporated by reference herein; and, in the case of a thing or things or personal property, if you find the same or any part thereof, to bring the thing or things or personal property forthwith before me at the courthouse of this Court.

Given under my hand, and issued at 09:14 on this 11th day of June, 2020.

Hobbs Sealing Approved:  **NO**              Night Service Approved.  **NO**

*Harris*

Judge Debra Harris

Warrant ID: 000038580

END OF WARRANT

11   The Government then produced this document to the defense (Bates 138,

12   cited by the prosecution in Dkt 189 at 6).  But while the Government claimed that

this warrant justified the initial search and seizure, it plainly could not have been—

it was issued over a year *after* the search took place, and the Fourth Amendment

makes it clear that search warrants are for "things *to be* seized" from places "*to be*

searched." Indeed it seems likely that this warrant had nothing to do with Mr.

Carasco.

The defense asked what the affidavit of probable cause was for this new

warrant—a document mandated by the United States Constitution in addition to

both Federal and State law—in order to demonstrate that the search warrant was

unrelated to Mr. Carasco or the narcotics and firearm for which he was charged,

and could not retroactively justify their seizure.[2] Rather than truthfully disclose the

actual affidavit of probable cause given on June 11th, 2020 to Judge Debra Harris,

the Government merely repurposed a page from 2019, as if it could be the actual

probable cause motivating a real 2020 search warrant (Bates 140):

**AND TO SEIZE IT IF FOUND** and bring it before me, or this court, at the courthouse of this court. This Search Warrant and incorporated Affidavit was sworn to and subscribed before me this <u>15th</u> **day of** <u>April</u>, **2019.** Wherefore, I find probable cause for the issuance of this Search Warrant and do issue it.

_____ , NIGHT SEARCH APPROVED: ☐ YES ☒ NO
(Signature of Magistrate)
**Judge of the Superior Court, High Desert Judicial District**

---

[2] In fact, California law requires that telephonic search warrants be recorded and documented. According to California Penal Code 1526, when a telephonic search warrant is issued, the affidavit or declaration of probable cause supporting it must be recorded. Additionally, the judge is required to prepare a written order, which is then filed with the court and retained as part of the official record. This requirement helps ensure the integrity of the process and provides a clear record of the authorization provided for the search.

1    Indeed, the Government was so bold as to submit before this Court a search

2    warrant "issued… on this 11th day of June, 2020" by "Judge Debra Harris" (Bates

3    138) and attach an "incorporated affidavit… sworn to and subscribed… this 15th

4    day of April, 2019" by Judge Lisa Rogan (Bates 140), claiming with a straight face

5    that the 2020 warrant could simultaneously be "the SW return for the warrant

6    executed on April 15, 2019" and *also* "the telephonic warrant signed on June 11,

7    2020" (Dkt 189 at 6).[3]

8    The defense requested that "the Government produce… the audio recording

9    and transcript of the telephonic warrant signed by Judge Debra Harris on June 11th,

10    2020" (Dkt 189 at 5); and on July 28th, 2021 Mr. Carasco again asked "where is the

11    probable cause to this warrant?" (Dkt 52 'SEALED' #330; Exhibit B).  The

12    defense continued to request the affidavit of probable cause pre-trial; again and

13    again, the Government refused to produce an actual search warrant with a related

14    affidavit of probable cause.  Instead, they made a variety of contradictory and

15    impossible claims (e.g. Dkt 189 at 6), ultimately inducing the court to (incorrectly)

16    inform the jury that the search warrants were valid and properly obtained, and that

---

[3] Indeed, the problems with this purported Lisa Rogan "warrant executed on April 15, 2019" are numerous; in
addition to those already raised (see Dkt 184, 188), it contains no time of issuance—contrary to California law
(Penal Code 1526).

1    the associated evidence was to be considered fully by them (Dkt 154, Page ID

2    #1154; Dkt 156, Page ID #:1355-1357; Dkt 158, Page ID #: 1551).[4]

3         The defense again raised the fact that the Government has never produced a

4    valid search warrant with affidavit of probable cause post-trial in various motions

5    filed while on direct appeal (e.g. Dkt 184,188, 189); the Government continues to

6    ignore their obligations to this day.

7         It is not surprising that the defense was not given the affidavit of probable

8    cause; it would presumably not even be related to Mr. Carasco or the narcotics and

9    gun that were seized, as that happened a year before the search warrant was issued.

10   As such, were that affidavit of probable cause to be produced, it would presumably

11   be for a different person, place to search, and set of objects to be seized, thus

12   rendering the entirety of the physical evidence against Mr. Carasco inadmissible.

13   So it would clearly be material exculpatory evidence (as well as strong

14   impeachment evidence on the SBSD officers who misrepresented the warrant's

15   purpose). In _United States v. Fisher,_ 711 F.3d 460, 46 (4th Cir. 2013), a "highly

16   uncommon circumstance[]" presented "in which gross police misconduct goes to

17   the heart of the prosecution's case" because a law enforcement officer described

18   events in a search warrant affidavit that did not occur and described statements by

19   a confidential informant "who had no connection to the case," leading to a new

---

[4] Indeed, this meets the bar for a new trial discussed in _Butler_: a new trial is warranted if an error "could, in any reasonable likelihood, have affected the judgment of the jury."

1   trial.  The instant case is even more egregious: it is not just that a search warrant

2   affidavit described events 'that did not occur,' but in fact the purported search

3   warrant affidavit is no such thing—it was written a year prior to the search

4   warrant's issuance, and bears a different judge's name on it.  And it is not just that

5   an affidavit contained statements by a CI 'who had no connection to the case'; it

6   appears that the entire affidavit of probable cause—were the Government ever to

7   truthfully disclose it—would have no connection to the case, as the search warrant

8   was issued fourteen months *after* the search.

9        Thus the affidavit of probable cause is clearly material and its suppression

10  was strongly prejudicial against Mr. Carasco; indeed there is more than just "a

11  reasonable probability that the suppressed evidence would have produced a

12  different verdict" (*Strickler v. Greene,* 527 U.S. 281, S. Ct. 1936).  It alone

13  requires a new trial.

14       **3.  Internal Affairs Misconduct Finding**

15       The SBSD officers engaged in serious and repeated misconduct against Mr.

16  Carasco—conduct which the Government has repeatedly turned a blind eye

17  toward.[5]

18       Pre-trial, Mr. Carasco filed a complaint with SBSD Internal Affairs alleging

19  misconduct on the part of his arresting officers including fabricated chain of

---

[5] See Dkt 190 for more detail on SBSD misconduct and the resulting prejudice at trial.

1   custody documents (September 5th 2020; see Dkt 190 at 9-15), identifying multiple

2   officers who testified for the Government at trial.  Mr. Carasco promptly alerted

3   the Government to his report (Dkt 140 at 13-14), and Internal Affairs responded to

4   confirm that they were "already investigating" these allegations (Dkt 190 at 10).

5         Post-trial, Mr. Carasco received a response from SBSD Internal Affairs,

6   sustaining nine findings of misconduct in their arrest of Mr. Carasco, including that

7   they "failed to complete and submit a search warrant return", and failed to submit

8   into evidence "audio belt recording[s]," a "Miranda interview," and "seized

9   ammunition," among other things (Dkt 199 at 31-32).  Mr. Carasco filed *Brady* and

10  rule 33 motions referencing this investigation post-trial while still on direct appeal

11  (Dkt 184, 188, 190).  And in fact, many of the arresting SBSD officers have since

12  been fired, including Dep. Nicassio.

13        But even prior to Internal Affairs sustaining the allegations, the Government

14  had an obligation to verify the integrity of the evidence they presented at trial.  Mr.

15  Carasco was convicted entirely based on the narcotics seized in the SBSD raid.

16  Per *United States v. Solorio,* 669 F.3d 943, 954 n.13 (9th Cir. 2012), when the

17  defense alleges discrepancies in the chain of custody for evidence presented at

18  trial, "before such evidence can be admitted, the prosecution must introduce

19  sufficient proof so that a reasonable juror could find that the items that the

20  prosecution seeks to admit into evidence are in 'substantially the same condition'

1   as when they were seized…. In other words, the district court may admit the

2   evidence if there is a reasonable probability the article has not been changed in

3   important respects." Here, Mr. Carasco did just that—challenging the chain of

4   custody and alleging (with substantial evidence!) that there were, as in *Gallego v.*

5   *United States,* 276 F .2d 914, 917 (9th Cir. 1960), "intermeddlers tampering with"

6   the narcotics.  Per *United States v. Dickerson,* 873 F.2d 1181, 1185 (9th Cir. 1988),

7   "if there is some evidence of tampering, then the government must show that

8   acceptable precautions were taken to maintain the evidence in its original state."

9       The Government entirely failed to fulfill this obligation.  They did not

10   'introduce sufficient proof' that the narcotics were in 'substantially the same

11   condition' as when they were seized—because, of course, the narcotics were *not* in

12   the same condition.[6]  They did not 'show that acceptable precautions were taken to

13   maintain the evidence in its original state,' because—again--those precautions

14   were *not* taken.  Indeed, the evidence shows that officers appear to have been not

15   just negligent but in fact *intentionally* misappropriated narcotics, along with cash

16   and other items.  As this misconduct would likely invalidate the evidence for

17   which Mr. Carasco was convicted, it is clearly material.

18       Many of these would individually be enough to undermine the integrity of

19   the trial, let alone together.  And yet it is only the beginning; Internal Affairs only

---

[6] See 'Misappropriated Narcotics,' below, for more detail

1    produced "limited" information about their investigation because "California law

2    restricts [Internal Affairs'] ability to disclose specific details… to the public" (Dkt

3    184 at 34-35).  The suppression of this evidence is thus both material and

4    prejudicial.

5          And SBSD Internal Affairs is clearly obligated to disclose the results of their

6    investigation to the Government or the defense under *Brady*.  In *Mellen v. Winn,*

7    *900 F.3d 1085 (9th Cir. 2018)*, the Ninth Circuit wrote that "the law… clearly

8    established that Police Officers were bound to disclose material, exculpatory and

9    impeachable evidence…. Police investigators violate *Brady* when they fail to

10   disclose material impeachment evidence to prosecutors" (citing to *Carrillo v.*

11   *County of Los Angeles,* 798 F. 3d 1210, 1219 9th Cir. 2015 and *Butler*; see also

12   *Kyles v. Whitley*; *Carriger v. Steward,* 132 F. 3d 436, 480 9th Cir. 1997).

13   **4. Misappropriated Narcotics**

14         Sometime between when the SBSD officers seized narcotics and when they

15   made it to TFO Mike Greene of the Fullerton Investigations Bureau for testing,

16   roughly one kilogram of narcotics went mysteriously missing and the rest were

17   tampered with (Dkt 194 at 2-5).

18         The state of the narcotics at seizure can be seen in the SBSD officer's photo

19   of it from April 15th, 2019 (Dkt 194 at 14).



1     *Narcotics **in their original state**. Bates 42: the narcotics seized from the*

2     *apartment in their original state; Government Exhibit 9 at trial.*

3

4     Roughly two months later, when TFO Mike Greene picked up the narcotics

5     around 10:15am on June 6th 2019, one kilogram of cocaine was missing and

6     another was altered (Dkt 194 at 34).[7]

---

[7] In particular, the weight of cocaine does not line up—it is approximately 9.5 kilograms at seizure (Bates 42, first photograph) versus approximately 8.5 kilograms at trial (partially represented by Bates 278, second photograph). In particular, one of the three bricks of cocaine appears to have been tampered, and the small baggies were swapped out and appear to have lost significant volume. See Dkt 194 for more details.



1   ***Narcotics after being tampered with.*** *Bates 278, which was taken after the*

2   *SBSD officers handed them off to TFO Mike Greene; this is the state of the*

3   *narcotics when they were physically presented, live, to the jury at trial as*

4   *Government Exhibits 2-3 (no longer in their original state).*

5

6   TFO Greene investigated this discrepancy and was aware of the missing and

7   tampered with narcotics.[8] And SBSD Internal Affairs confirmed, before trial, that

8   they were "already investigating" the allegations of manipulated chain of custody

9   documents (Dkt 190 at 9-10).  But the defense has never been given an explanation

10  for the missing narcotics, nor for the fact that the remaining packages were

11  tampered with, no longer in the packaging that they were seized in.

_____

[8] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ "  ▓▓▓▓▓▓  ▓▓▓▓▓▓▓▓▓▓▓

1        Despite this Dep. Nicassio, the "lead agent in the investigation of [Mr.

2    Carasco]" (Dkt 133 at 9), testified at trial that the narcotics were "the same thing"

3    in the same "packaging material" containing "everything [he] found in that safe"

4    (Dkt 154 at 132). This was false testimony; it is clear from the pictures above that

5    the baggies are not the same in Bates 278 as Bates 42, and neither are the narcotics

6    in the same state.  Furthermore, the quantities of narcotics appear to differ

7    significantly between the two (Dkt 194 at 1-5).  Some of the narcotics were

8    misappropriated, and the rest had been tampered with.  And the Government failed

9    in their duty under _Alcorta v. Texas,_ 355 U.S. 28 1957 to correct the false

10   testimony.  As those narcotics formed the entire basis for Mr. Carasco's

11   conviction, suppression of evidence that they were tampered with would certainly

12   'cast doubt upon the correctness of the conviction' (as in _Imbler v. Pachtman_).  A

13   showing that a trial was infected by false testimony need not rise to the level of a

14   constitutional violation in order to be grounds for a new trial; per _United States v._

15   _Catton_ (89 F.3d 387, 388 7th Cir. 1996), "it is enough if the jury might have

16   reached a different conclusion had the testimony not been given."

17        Mr. Carasco repeatedly requested more information on the narcotics, and

18   was not given it until one week before trial (Dkt 140 at 3).[9]  The Government tried

---

[9] The Government did not produce those documents to him until one week before trial, when he was no longer
represented by counsel (Dkts 67, 72). Per _United States v. Aviles-Colon, 536 F.3d 1; 2008 1ˢᵗ Circuit,_ "the pertinent
inquiry is whether defendant's counsel was prevented by the delay from using the disclosed material effectively in

1    to sidestep this late production by deceptively stating that "these lab reports were

2    produced two years ago.  They are actually Bate stamps 1, 2, and 3" (Dkt 140 at 4);

3    but those were just a cursory outline of the DEA analysis of the narcotics—not, for

4    instance, the photograph of the narcotics after they had been tampered with (Bates

5    278, above).  Post-trial—but while still on direct appeal—Mr. Carasco spelled out

6    the missing narcotics in detail (Dkt 194).  Like in *Aviles-Colon 536 F.3d 1 1st*

7    *Circuit 2008*, "the failure to make a timely disclosure of these DEA reports"

8    entitles Mr. Carasco to a new trial by undermining the testimony of a key

9    government witness (Dep. Nicassio).

10        Nor should the Government have been unaware of the missing and tampered

11    with narcotics.  TFO Mike Greene, who investigated the narcotics and found

12    discrepancies, would later sit at the prosecution's table during trial (Dkt 154 at 4

13    lines 4-7).  The Government was alerted to the missing Sheriff's Crime Lab

14    analysis (Dkt 140 at 8), and to the missing narcotics (Dkt 140 at 14).

15        Furthermore, the defense was improperly prevented from effectively

16    challenging the narcotics at trial.  Despite Government assurances that the DEA

17    chemist Monica Price would testify (Dkt 140 at 4), she did not, denying the

---

preparing and presenting the defendant's case… the defendant must make a prima facie showing of a plausible
strategic option which the delay foreclosed."  In fact, On October 7th 2021, Mr. Carasco told the Court that "I'm
asking the government if they would be gracious enough to just spare me a week or two weeks or a little bit of time
so that way I can maybe have [Mr. Carasco's former attorney] Kessel help me get the information I need and go
over these documents with the DEA [lab reports and photographs, Bates 487-638]" (Dkt 140).  Mr. Carasco's
request was denied.

1   defense the opportunity to cross-examine her.  Instead of calling a witness who had

2   *actually* tested the narcotics, the Government actively and repeatedly elicited

3   testimony from Dep. Nicassio at trial that the narcotics were "all tested by a

4   chemist" and found to be "positive for cocaine" (Dkt 154 at 129, 130, 133).  Dep.

5   Nicassio's testimony deceptively employed the passive voice—stating, for

6   instance, that a white substance "was ultimately tested and tested positive for

7   cocaine" (Dkt 154 at 129)—evading the question of *who* had tested the narcotics.

8   Perhaps Dep. Nicassio meant that *he* and his team had tested the narcotics; he

9   elsewhere wrote that the narcotics were "sent to the Sheriff's Crime Lab for

10   Analysis" (Dkt 194 at 22) between seizure and TFO Greene's receipt of them.  But

11   the defense has never been given any evidence that they were actually sent there,

12   and in fact the Government grudgingly admitted that no such test took place.[10]

13   There is absolutely no evidence that this 'Sheriff's Crime Lab' analysis ever

14   happened.  On the other hand, if Dep. Nicassio was referring to the ultimate DEA

15   analysis lead by Monica Price, his testimony would be in violation of Mr.

16   Carasco's rights under the Confrontation Clause and as a result of his right to a fair

17   trial, because Dep. Nicassio had no involvement in that analysis (see *Melendez-*

---

[10] The Government at one point claimed that "The Sheriff's Department lab analysis… was already produced… at Bates 172 to 179" (Dkt 140 at 9).  This couldn't be true, as Bates 172 to 179 refer to tests done on March 13th 2019 (Bates 176) and refer to roughly 54 grams of narcotics (Bates 178), a month *before* the seizure in the instant case of over 6 kilograms of narcotics (Bates 32).  Mr. Carasco pointed out that the prosecution was deceptively referring to a month-earlier search of a BMW unrelated to this case, at which the Government admitted that "ultimately they were never tested by the OC Sheriff's" (Dkt 140 at 12), contrary to their initial assertion.

1   *Diaz v. Massachusetts,* 557 U.S. 305, 129 S Ct 2527, 174 L Ed 2d 314, 2009).

2   Whether Dep. Nicassio was referring to a fictitious analysis, or to one he had no

3   involvement in, the jury was informed that "a chemist" had analyzed the narcotics

4   and found them to be cocaine, but Mr. Carasco was not permitted to cross examine

5   this chemist.  Perhaps it is unsurprising that the Government did not ultimately call

6   her as a witness; it denied the defense a chance to cross examine her and elicit

7   testimony that—for instance--the narcotics had been tampered with.

8       As such, the suppression of the evidence that narcotics were tampered with

9   was both materially prejudicial, and timely.

10  **5. Missing Cell Phones**

11      The SBSD officers found and confiscated cell phones in the raid (Dkt 196).

12  However, neither these cell phones, nor any of the information contained in them,

13  have ever been produced to the defense, despite numerous requests; indeed it

14  seems that they never made it to SBSD evidence room in the first place.

15      Those cell phones would contain material *Brady* information.  They were

16  connected to a 'Ring' camera system that monitored both the inside and outside of

17  the apartment.  Dep. Nicassio testified at trial that "there were cameras on the

18  outside of the apartment" (Dkt 154 at 117), and corroborated by Lt. Smith

19  discussing "that little 'Ring' camera… showing the guys up at the apartment right

20  now" through the seized cell phones (Dkt 196 at 10).  These cameras took live

1    footage of the full April 15th, 2019 raid on the apartment and the associated seizure

2    of narcotics, cash, and a gun; that footage was stored on the cell phones.

3         This footage would show who placed the narcotics in the safe in the first

4    place and who rented and lived in the apartment (Dkt 196 at 2-3).  This plainly

5    meets the necessary materiality standard—both as exculpatory information for Mr.

6    Carasco, and as impeachment evidence for the Government witnesses at trial, all of

7    whom were SBSD officers.  Demonstrating that Mr. Carasco was not in fact

8    responsible for the narcotics would clearly (as in *Imbler v. Pachtman*) 'cast doubt

9    upon the correctness of the conviction' that was based entirely on those narcotics.

10        In addition, the footage would show which evidence was stolen during the

11   raid—and which was planted.  As discussed above, roughly 1 kilogram of

12   cocaine—worth over $20,000—went missing.  Louis Vuitton receipts purporting to

13   tie Mr. Carasco to the apartment appear to have been planted.  It would show Mr.

14   Gonzalez, the actual owner of the apartment, exiting the apartment that morning, as

15   Mr. Carasco alleged but was unable to substantiate at trial ("the owner was here

16   too last night… [he] just left right now… it's not my apartment; it belongs to Jesse

17   Gonzalez", Dkt 196 at 8).  It would show that Dep. Nicassio testified falsely about

18   where he found cash in the raid—much of which would later go missing.[11]  This

---

[11] See, e.g., Dep. Nicassio testifying, of the cash displayed in Bates 42, that he "took the money from the vehicle" and that it was "not from the apartment" (Dkt 154 at 174-175, 177), whereas Dep. Mondragon testified that it was found in the safe in the apartment (Dkt 156 at 46-47).

1  would have been material impeachment evidence for the Government witnesses at

2  trial, including Dep. Nicassio.

3      The Government was alerted to the missing cell phones pre-trial (Exhibit C);

4  post-trial; and at sentencing (Dkt 135 at 10 line 15 to 11 line 5), with the defense

5  requesting that the Government "please immediately produce forensic image of the

6  data from the two cell phones taken from Mr. Carasco" because "in those cell

7  phones is evidence of what was really taken from that apartment."  Despite that

8  neither the cell phones nor any of their contents have ever been produced—indeed,

9  the SBSD officers were recording speculating about potentially tampering with the

10  seized cell phones (Dkt 196 at 10).[12]  This alone is similar to the Brady violations

11  that threw out the conviction *United States v. Bundy*, where "surveillance-camera

12  evidence" was withheld (*United States v. Bundy,* 968 F.3d 1019; 9th Circuit 2020).

13      **6. Suppressed Confidential Informant**

14      Pre-trial, the defense asked the prosecution for "any cooperating witnesses

15  or informants who provided information regarding the investigation of this case,"

16  information about "any confidential informant," and "records of payments…

17  received by the CI" (Dkt 197 at 8 #24-25, 9 #28; Exhibit D).[13]

---

[12] It is common sense that surveillance footage would be among the first things seized and analyzed as part of a law enforcement raid meant to investigate potential criminal activity at a location.  But not only is there no evidence that the cell phones made it to the SBSD evidence room; it does not appear that 'Ring' cameras or its cloud-based storage were ever produced to the defense.  As such, the SBSD officers entirely suppressed the surveillance footage.
[13] See Dkt 196 for more detail on the undisclosed confidential informant and associated payment.

1    The prosecution responded by simply saying that "we are not aware of any

2    informants being used in this case against defendant" (Dkt 197 at 13 #28; Exhibit

3    D).

4    And yet, *Brady* material in the possession of the Government contains the

5    following dialogue from Mr. Carasco's arrest (Dkt 196 at 11):

6        Carasco: how'd you find me?

7        …

8        Lt. Smith: you got people, man.  Some people like you, but not

9        everybody.  Sooner or later you're gonna come across somebody

10       that's…

11       Carasco: Brianna?

12       Lt. Smith: A little bit of cash goes a long way.  Little bit of cash for a

13       little bit of info, works out pretty well.

14   It is clear that in fact, contrary to the Government's representations, there

15   *was* a confidential informant, and they *were* paid "cash" for their "info"—but the

16   Government suppressed both their existence and the payment from the defense.

17   This information would have been material.  Establishing Mr. Carasco's

18   ownership of the apartment and its contents was a necessary piece of the

19   Government's argument at trial.  But to this day, it rests solely on the testimony of

20   Dep. Nicassio.  For instance, the building management did not testify about who

1    rented the apartment—instead, Dep. Nicassio himself claimed that management

2    told him Mr. Carasco personally went into the leasing office and paid cash to rent

3    the apartment, despite contradictory documentary evidence.[14] Here, Dep.

4    Nicassio's testimony is entirely uncorroborated, and essential to the conviction.

5        Mr. Carasco's central defense at trial was that he was not, in fact, the owner

6    of the apartment or the narcotics found in it; that he was merely a guest there—as

7    is supported by the actual underlying evidence.  Were he able to convince the jury

8    of this, he would presumably have been acquitted of charges stemming from those

9    narcotics.  Indeed, he informed the Court that "the only evidence I would like to

10    introduce is the payment from my friend Jesse Gonzalez to his apartment"; but the

11    witness he called for this express purpose was none other than Brianna (Dkt 156 at

12    161).  It appears that—unknown to the defense--the sole *defense* witness called at

13    trial, meant to establish the core of Mr. Carasco's defense, was in fact a

14    confidential informant for the Government, *paid by the Government*.  Like in

15    *Butler*, "the prejudicial effect of the nondisclosure of the requested information on

16    the defense's ability to present its case fairly"—the defense being informed by the

17    Government that there were no informants--meant that "the defense was denied the

18    opportunity to present impeaching evidence which could seriously have affected

19    the jury's assessment" of the witness.  In fact, the defense might not have called

---

[14] There is a documentary record of Mr. Gonzalez renting the apartment with a check, not Mr. Carasco with cash. See below, and Dkt 184 at 32.

1    Brianna to testify in the first place if it had been aware that the Government's

2    disclosure was false, and might have instead called another witness—like the

3    building management—to contradict the Government witness' deceptive

4    testimony.

5         Furthermore, it appears that Mr. Gonzalez—the actual owner of the

6    apartment—may have been an undisclosed confidential informant. Mr. Gonzalez

7    had told Mr. Carasco to use his parking space, and was seen exiting the apartment

8    as the SBSD officers prepared to enter it[15]—but the officers ignored his presence.

9    Were the defense not to have been falsely told that there were no confidential

10   informants, it may have chosen to call Mr. Gonzalez—the owner of the apartment

11   in which the narcotics were found—as a witness at trial.

12        It does not matter which part of the Government's investigation was

13   managing the confidential informants; in *Butler*, the Ninth Circuit found that "the

14   prosecutor is responsible for the nondisclosure of assurances made to his principle

15   witnesses even if such promises by other government agents were unknown to the

16   prosecutor." And, in fact, the prosecution in the instant case was reminded pre-

17   trial of their obligations under *United States v. Wood,* (57 F.3d 733 9th Cir. 1995)

18   and *United States v. Santiago,* (46 F.3d 885, 893 9th Cir. 1995) to "inquire of each

---

[15] See 'Missing Cell Phones' for more detail.

1  government agent" for information "even when held by another agency involved in

2  the investigation" (see Exhibit D).

3      And yet the Government falsely informed the defense that there were no

4  confidential informants—let alone ones paid by the Government.  Instead, the

5  prosecution allowed false testimony by their key witness, Dep. Nicassio, that—

6  rather than a confidential witness they paid cash to—they located Mr. Carasco via

7  "a license plate system" called ALPR (Dkt 154 at 145-151).  The prosecution has a

8  duty to alert the defense to false testimony by its witnesses (*Alcorta v. Texas*,

9  *United States v. Catton*), and "a conviction obtained through use of false evidence,

10  known to be such by representatives of the State, must fall under the Fourteenth

11  Amendment" (*Napue v. Illinois,* 360 U.S. 269, 79 S. Ct. 1173, 3 L. ed. 2d 1217

12  1964).

13      As such, the suppression of the existence of confidential informants and

14  payments made to them was material and justifies a new trial for Mr. Carasco.

15  **7. Suppressed Personnel Records**

16      A prosecutor has an affirmative duty to examine the personnel files of law

17  enforcement officers he intends to call as witnesses if the defense requests

18  production of the files (*United States v. Alvarez,* 86 F.3d 901 9th Cir. 1996; *United*

19  *States v. Henthorn,* 931 F.2d 29 9th Cir. 1992).  This duty is now the official policy

20  of the Justice Department.

1    The arresting SBSD officers were acting as cross-sworn federal US

2    Marshals during their arrest of Mr. Carasco (Dkt 154 at 109, CARASCO_00232, at

3    9:30-9:35).  Furthermore, when purportedly applying for a GPS search warrant,

4    Dep. Nicassio of the SBSD wrote that they were acting as "Deputy U.S. Marshals"

5    (Dkt 189 at 19-20).

6    And many of the SBSD officers involved in Mr. Carasco's arrest—including

7    Lt. Joshua Smith (A7276), Dep. Gaetano Nicassio (D9599), Det. Eric Rose

8    (E7442), Det. Eugean Mondragon (D3391), and Dep. Amir Awad (F3069)—were

9    also prosecution witnesses at trial; in fact the SBSD officers were the *only*

10   government witnesses.

11   As such, the SBSD officers clearly fall under the Government's *Henthorn*

12   obligations to "examine the personnel files" upon request.  And in fact, the defense

13   clearly made the necessary *Henthorn* request pre-trial, asking the Government to

14   produce "all personnel files of all law enforcement witnesses whom the

15   government intends to call at trial. *United States v. Henthorn*."  (Dkt 197 at 6,

16   April 23rd 2020; Exhibit D.)

17   The prosecution responded on June 25th, 2020, simply that asserting that "we

18   have complied and will continue to comply with our Henthorn obligations.  If need

19   be, we will submit files to the court for in camera inspection."  (Dkt 197 at 12;

20   Exhibit D.)  However, the Government never followed up on their Henthorn

1    obligations—there is no evidence that they ever actually inspected the officers'

2    personnel files, and they certainly did not present them for in-camera review,

3    therefore constituting error as in Henthorn.  Instead, the defense is only in

4    possession of "limited" information about the Internal Affairs investigation

5    because "California law restricts [Internal Affairs'] ability to disclose specific

6    details... to the public" (Dkt 199 at 31).

7            As discussed in the 'Internal Affairs Misconduct Finding' section above, this

8    is not mere speculation that there *might* be impeachment evidence; the personnel

9    files would have been material.  SBSD Internal Affairs has already sustained nine

10   findings of misconduct in their arrest of Mr. Carasco involving the same SBSD

11   officers that testified for the Government at trial (Dkt 199 at 31-32).  Many of

12   these would individually be enough to undermine the integrity of the trial, let alone

13   together.  And this information would be found not only with SBSD Internal

14   Affairs, but also with the "USMS [U.S. Marshals' Service] Southwest Region" for

15   which the officers were operating (Dkt 197 at 2).

16           The defense *has*, here, established a strong basis for materiality.  But even if

17   it *hadn't*, under *Henthorn*, the Government still has a duty, upon request, to inspect

18   personnel records of the SBSD officers cross-designated with the U.S. Marshals—

19   this duty exists regardless of any showing of materiality by the defense (*Henthorn,*

20   *931 F.2d at 31).*  And it does not appear that the Government took even this step.

### 8. Caracso's Identification

Mr. Carasco was arrested, tried, and convicted based on narcotics found in an Anaheim apartment. Mr. Carasco did not own or rent that apartment—Jessie Gonzalez did. Mr. Carasco was merely a guest, while the narcotics were found in a locked safe in "the closet of the master bedroom" (Dkt 202 at 5).

There is no question about whose apartment this was. In a 2019 statement, the SBSD officers swore, "under penalty of perjury", that "the apartment is rented to a Jessie Gonzalez" (Dkt 184 at 26). Indeed, the check paying for the apartment was "from: Jessie Gonzalez" (Dkt 184 at 32).

And yet, *despite* the Government being in possession of this unambiguous evidence, their key witness—Dep. Nicassio—testified that Mr. Carasco rented the apartment with cash (Dkt 154, Page ID #:1344-1346):

> Q: And you also know from your discussion with the apartment
>
> management that the defendant used an alias to rent that apartment
>
> out?
>
> A: Yes, sir.
>
> Re-cross:
>
> A: There was no information or no receipts or no documentation that
>
> Jesse Gonzalez lived there.
>
> . . .

1    A: It wasn't until I showed her your [Mr. Carasco's] picture that she

2    said that's the guy that actually came in and rented the apartment.

3    …

4    Q: She said cash was used?

5    A: Yes, sir

6    Another SBSD officer, Dep. Eric Rose, similarly testified that he "believe[d]

7    that was Jesus Carasco's apartment" (Dkt 156 at 87).[16]

8    This testimony was false: it is clearly contradicted both by Dep. Andrew

9    Pollick's 2019 statement of probable cause as well as by the actual payment itself

10    (Dkt 184 at 26, 32).  And it is uncorroborated—while Dep. Nicassio testified about

11    his "discussion with the apartment management," no witnesses from the

12    apartment's management themselves testified to this discussion.

13    The prosecution had a duty, under *Alcorta*, *Napue*, and *Giglio* to alert to this

14    false testimony.  "A claim under *Napue* will succeed when (1) the testimony (or

15    evidence) was actually false, (2) the prosecution knew or should have known that

16    the testimony was actually false, and (3) the false testimony was material."  (*Hayes*

17    *v. Brown*, 339 F.3d 972, 984 (9th Cir. 2005) (en banc).)  And it is "irrelevant"

18    whether the defense knew about the false testimony and failed to object or cross-

19    examine the witness, because defendants "c[an] not waive the freestanding ethical

[16] Dep. Rose did not cite any justification for this belief other than stating that "his vehicle was parked there" (Dkt 156 at 87).

1  and constitutional obligation of the prosecutor as a representative of the

2  government to protect the integrity of the court and the criminal justice system."

3  *N. Mariana Islands v. Bowie,* 243 F.3d 1109, 1122 (9th Cir. 2001*)*.  And "whether

4  defense counsel is aware of the falsity of the statement is beside the point"

5  (*Belmontes v. Brown,* 414 F.3d 1094, 1115 9th Cir. 2005)—although, in this case,

6  Mr. Carasco clearly *did* voice his disagreement.  "When a prosecutor suspects

7  perjury, the prosecutor must at least investigate" further, consistent with his "duty

8  to correct what he knows [or suspects] to be false and elicit the truth" (*Morris v.*

9  *Ylst,* 447 F.3d 735, 744 (9th Cir. 2006)*;* citing *Napue v. Illinois)*.

10  But not only did the Government not alert the Court and jury to this false

11  testimony, or 'investigate' the testimony—the Government *actively elicited* it in

12  their direct examination.

13  And it is strongly material exculpatory evidence.  Mr. Carasco was

14  convicted for the narcotics seized in that apartment; whether or not it was in fact

15  his apartment bears heavily on whether those narcotics are attributed to him.  The

16  jury, here, was told—falsely--by a police officer that Mr. Carasco "actually came

17  in and rented the apartment" with "cash," whereas in fact the apartment was paid

18  for by check, and rented by, Jessie Gonzalez (Dkt 184 at 32).  And the prosecution

19  highlighted Dep. Nicassio's testimony in summation (Dkt 158 at 23).

### 9. Planted Louis Vuitton Receipts

Other than Dep. Nicassio's clearly false testimony that Mr. Carasco rented the Anaheim apartment (see above), the only evidence presented by the Government to tie the defendant to the narcotics seized were a set of 'Louis Vuitton receipts' with Mr. Carasco's name on them that the SBSD officers purport to have found there.

Dep. Nicassio—the same SBSD officer who lied under oath about the apartment payment and was the "lead agent" (Dkt 133 at 9) of the team that misappropriated tens of thousands of dollars of evidence—testified at trial that he "personally... collect[ed]... from the apartment" a set of "receipt[s] from Louis Vuitton" naming "Jesse Carasco" (Dkt 184 at 4). The Government cited this at summation, reminding the jury that "they found receipts with the defendant's name on them [inside the residence]... with the name Jesse Carasco, correct, initials L.V., Louis Vuitton" (Dkt 158 at 23, 28).

And yet, the same search warrant return Mr. Carasco received post-trial contains a 'search warrant receipt' (Dkt 184 at 4-5) which Dep. Nicassio confirmed specified the items seized in the apartment "in detail" (Dkt 184 at 4-5), and it does not mention any such receipts—undermining the core link the Government alleged between Mr. Carasco and the seized narcotics. Nor can these Louis Vuitton

1   receipts be found in any of the pictures taken by the officers at the time of the raid

2   (see, e.g., Dkt 194 at 14-20).

3       Like for the search warrants, this information is newly discovered post-trial

4   from the Victorville response. And it is material. As it is essentially

5   uncorroborated, removing the false testimony would sever the primary link

6   between Mr. Carasco and the narcotics, and if the narcotics were not his then there

7   would be nothing to convict him of. As such, it justifies a new trial under Rule 33.

8       **10. Purported Confession**

9       In an "Evidence/Property Report" written on April 16th, 2019—the day after

10  Mr. Carasco's arrest—Dep. Nicassio wrote (Bates 7-9) that he "read [Mr. Carasco]

11  his Miranda Warning… Carasco stated the safe was his. All the items inside the

12  safe were his." At trial, Dep. Nicassio gave similar testimony, stating that he

13  "admitted to the cocaine and heroin being his… He self-admitted that it was his

14  apartment." (Dkt 154 at 135-137).

15      And yet none of the SBSD officers' recordings from the day of his arrest

16  contain this purported confession (Dkt 202), nor do they show Dep. Nicassio

17  reading Mr. Carasco his Miranda rights—instead they show a *different* deputy, Lt.

18  Smith, reading Mr. Carasco his Miranda rights, long after Dep. Nicassio claims the

1  reading and confession took place.[17] And there is certainly no such confession in

2  that conversation.

3       Upon being pressed on the fact that, despite the hours of recordings from

4  that day, no such confession appears, Dep. Nicassio testified that the recording was

5  "deleted or erased" (Dkt 154 at 136), without giving any explanation to how this

6  could have happened.  Mr. Carasco has consistently denied having given this

7  purported confession, and maintained his innocence.

8       Dep. Nicassio's behavior bears more than a passing resemblance with Det.

9  Saldate in _Milke v. Ryan,_ 711 F.3d 998 (9th Cir. 2013).  In _Milke v. Ryan,_ the

10  defendant—Debra Milke—was convicted based on a purported confession given to

11  Det. Saldate.   Det. Saldate testified that he read out her Miranda rights and she

12  understood them, and that Milke refused a lawyer and agreed to talk.  Milke, on the

13  other hand, testified that "she said: 'No, I need a lawyer.'  According to Milke,

14  Saldate ignored her request… then embellished and twisted Milke's statements to

15  make it sound like she had confessed."  Saldate "skipped the basic step of having

16  Milke sign a _Miranda_ waiver."  He "didn't record the interrogation," and "not even

17  Saldate's interview notes made it into court: Saldate testified that he destroyed

18  them."  No witnesses at trial testified to having observed Milke commit the

19  crime—the only source of evidence was Det. Saldate.

---

[17] It also appears that Lt. Smith did not read Mr. Carasco his entire Miranda rights—just one of the four prongs (Dkt 202 at 7).

1          The defense "requested Saldate's entire personnel file including all records

2    of any Internal Affairs investigations," and in fact those files would have showed

3    that Det. Saldate had a "long history of lying under oath and other misconduct"

4    which "should have been disclosed to Milke and the jury" so that the defense could

5    "effectively cross-examine Saldate."  But the files were not produced; instead, "the

6    state remained unconstitutionally silent."  "The prosecution's suppression of this

7    report [of misconduct]... distorted the fact-finding process, forcing the state judge

8    to make her finding based on an unconstitutionally incomplete record."

9          Post-trial, Milke discovered and presented the court with records that

10   "Saldate had committed misconduct, either by lying under oath or by violating

11   suspects' *Miranda* and other constitutional rights during interrogations," but the

12   court erroneously failed to demand production of Det. Saldate's full record.  When

13   presented with such evidence, "the trial court must do more than take the

14   government's word that *Brady* material doesn't exist--the court must review the

15   files in question."

16         Ultimately, the 9th Circuit overturned Milke's conviction, writing that "by

17   withholding key evidence that it had a duty to produce, the prosecution induced a

18   defect that causes us to more than merely doubt whether the process operated

19   properly.  We can be certain it didn't."  And, although the prosecution was in fact

20   made aware of Saldate's pattern of misconduct, "even if there somehow weren't

1   actual knowledge of Saldate's misconduct, inadvertent failure to disclose is enough

2   for a *Brady* violation." In a concurrence, the Chief Judge wrote that "Saldate

3   destroyed the notes he supposedly took while questioning Milke, so we have

4   absolutely *nothing* contemporaneous with the supposed confession… leaving us

5   with no objectively verifiable proof as to what happened [in the interrogation].  All

6   we have are the conflicting accounts of a defendant with an obvious reason to lie

7   and a detective whose distain for lawful process is documented… No civilized

8   system of justice should have to depend on such flimsy evidence."

9           The parallels to the instant case are clear.  Dep. Nicassio testified that Mr.

10  Carasco confessed—but there are no recordings of this confession; like Det.

11  Saldate with his notes, Dep. Nicassio claims that the recordings were "deleted or

12  erased" (Dkt 154 at 136).  There is no evidence of a proper *Miranda* reading ever

13  having taken place.  As there was no independent evidence tying Milke to the

14  murder in her case, there is no independent evidence tying Mr. Carasco to the

15  narcotics in this one—other, that is, than Dep. Nicassio's word.[18]  Mr. Carasco has

16  consistently maintained his innocence and denied having given any such

17  confession, as did Milke.

---

[18] Including, of course, Dep. Nicassio's claims about receipts supposedly found in the apartment—which no
physical evidence actually corroborates—and Dep. Nicassio's claim about the building management saying Mr.
Carasco owned the apartment, which is directly contradicted by the physical evidence.

1    And in both cases, the testifying police officer formed the backbone of the

2    Government's case.  "Without Saldate's testimony, the prosecution had no case

3    against Milke."  Similarly, Dep. Nicassio was both the "lead agent in the

4    investigation of [Mr. Carasco]" (Dkt 133 at 9), and also the prosecution's star

5    witness at trial.  He is the one who found the narcotics which formed the basis for

6    Mr. Carasco's conviction, and the one who testified about them (Dkt 154 at 132).

7    The Government, in summation, told the jury that "cross-corroborating and

8    interlocking evidence" (Dkt 158 at 21)—but that 'cross-corroborating' evidence,

9    according to the Government, was Dep. Nicassio's testimony about Mr. Carasco's

10   residence, Dep. Nicassio's testimony about the parking garage, Dep. Nicassio's

11   testimony about the Louis Vuitton receipts, Dep. Nicassio's testimony about a

12   handbag (Dkt 158 at 22-23), Dep. Nicassio's testimony about the purported

13   confession (Dkt 158 at 24), and Dep. Nicassio's testimony about Mr. Carasco

14   paying cash (Dkt 158 at 28).

15   Like the defense in *Milke v. Ryan*, Mr. Carasco has repeatedly requested the

16   personnel files of the arresting and testifying officers under *Henthorn* and *Giglio*;

17   and in neither case were they actually produced.  Both began discovering the first

18   pieces of the expected impeachment evidence post-trial—in Mr. Carasco's case,

19   nine sustained findings of misconduct against the arresting and testifying officers

20   from SBSD Internal Affairs, including that they failed to submit any recordings of

1  a purported Miranda reading into evidence.  Those are from the instant case

2  *alone*—ignoring all of the officers' previous misconduct—and even here the

3  disclosures were "limited."  The 9th Circuit wrote in *Milke v. Ryan* that "even

4  today, some evidence relevant to Saldate's credibility hasn't been produced"; the

5  evidence provided by Milke "showing Saldate's misconduct—misconduct that

6  should have been disclosed by the state—suggested that the personnel file would

7  contain even more [misconduct]."  The same is true of Dep. Nicassio in the instant

8  case.

9       The 9th Circuit ultimately reversed Milke's conviction, and ruled that, going

10  forward, "the district court shall order the state to provide Milke's counsel with

11  Saldate's police personnel records covering all of his years of service, including

12  records pertaining to any disciplinary or Internal Affairs investigations... After the

13  state has turned over these records, it shall provide a statement under oath from a

14  relevant police official certifying that all of the records have been disclosed and

15  none have been omitted, lost or destroyed... the district court shall order Milke

16  released unless the state notifies the court within 30 days that it intends to retry

17  Milke."

18

19      **(III) New Evidence**

20

1    Pre-trial, the defense repeatedly—and unsuccessfully—asked the

2  Government for clarity on what the purported search warrant and affidavit of

3  probable cause were (see above).  Based on the Governments attestations, the

4  Court ruled at trial that the associated evidence was to be considered fully by the

5  jury (Dkt 154, Page ID #1154; Dkt 156, Page ID #:1355-1357; Dkt 158, Page ID #:

6  1551).  But *post-trial*, the Victorville Courthouse supplied a certified copy of it to

7  the defense (Dkt 184 at 18-27).  That certified copy made it clear that the 2020

8  Debra Harris search warrant did not have *any* plausible affidavit of probable

9  cause—the closest it came was a document written over a year earlier, with a

10  *different* judge's name on it.

11    In addition, the Internal Affairs response—which sustained nine findings of

12  misconduct by the SBSD officers against Mr. Carasco—was sent to Mr. Carasco

13  post-trial; in addition to the direct exculpatory evidence it contains, the sustained

14  findings would also have been extremely powerful impeachment evidence against

15  the Government's witnesses at trial—all of whom were SBSD officers implicated

16  by the misconduct.  And there is still more to come—as Internal Affairs only

17  produced "limited" information about their investigation because "California law

18  restricts [Internal Affairs'] ability to disclose specific details… to the public" (Dkt

19  184 at 34-35).  But it's clear that the Government's *Brady* obligations supersede

20  the limitations of the California transparency laws referenced by Internal Affairs;

1  as in *Wood*, "it is difficult to see what could be more explicit authorization by law

2  [for a Government agency to disclose documents] than the order of the district

3  court enjoining on the government its constitutional duty to make *Brady* material

4  available to the defense" (*United States v. Wood*, 57 F.3d 733; 9th Cir. 1995).

5       Prior to and during trial, Mr. Carasco denied that his purported confession

6  had ever actually happened; but nonetheless, Dep. Nicassio testified to it during

7  trial (Dkt 154 at 135-137).  Mr. Carasco, who represented himself at trial, was not

8  given the recordings of his arrest—in which the purported confession and

9  associated Miranda reading are notably absent—until after trial, at which point he

10  alerted the Court and Government to it (see Dkt 202).  The Government

11  highlighted Dep. Nicassio's testimony to the jury during summation (Dkt 158 at

12  24), which Mr. Carasco was unable to effectively counter because—as in *Milke v.*

13  *Ryan*—he was not in possession of the recordings, nor the documentation of Dep.

14  Nicassio's pattern of misconduct.

15       Finally, the same Victorville Courthouse response that implicates the

16  purported 'search warrant' also contains the 'search warrant receipt' (Dkt 184 at 4-

17  5) which undermines Dep. Nicassio's false 'Louis Vuitton receipt' testimony.

18

19  **(IV) Rule 33**

20

1    Recently, the Government responded to the Rule 33 motion along with the

2    *Brady* requests (Dkt 207) upon request from the Court.  The response included no

3    substance at all regarding the Rule 33 motion, instead merely claiming that the

4    motion was "unpersuasive for those same reasons identified by the government in

5    its earlier opposition."

6    **1. Legal Standard**

7    Federal Rule of Criminal Procedure 33 allows a court to "vacate any

8    judgment and grant a new trial if the interest of justice so requires."  The district

9    court "is not obliged to view the evidence in the light most favorable to the verdict,

10   and is free to weigh the evidence and evaluate for itself the credibility of the

11   witnesses." (*United States v. Kellington,* 217 F.3d 1084, 1095 9th Cir 2000.)  From

12   *United States v. Durgin,* 444 F.2d 308 (9th Cir. 1971), citing *United States v. Polisi,*

13   416 F.2d 573 (2nd Cir. 1969):

14           The generally held essentials for a new trial based on newly

15           discovered evidence are the following: (1) the evidence must have

16           been discovered since trial; (2) it must be material to the factual issues

17           at the trial, and not merely cumulative nor impeaching the character or

18           credit of a witness; (3) it must be of such a nature that it would

19           probably produce a different verdict in the case of a retrial.

1    In addition, *Durgin* identifies two exceptions to the normal standard in the

2    case of Constitutional violations—like *Brady* and *Giglio* violations.  The first

3    exception is that, *regardless* of the ultimate materiality of the *Brady* material to

4    trial:

5           A new trial is required where the prosecutor's failure to disclose was a

6           considered decision for the sake of obstruction, or where the value of

7           the evidence to the accused could not have escaped him.

8    The second exception—which lies somewhere between the general case and

9    the first exception—is that:

10          Where the non-disclosure is passive… [the suppressed] evidence must

11          be material and of some substantial use to the defendant.

12    This results in three different standards.  For general newly discovered

13    evidence, the test is if "it would probably produce a different verdict."  For passive,

14    non-negligent failures to disclose *Brady* and *Giglio* material, the suppress evidence

15    "must be material and of some substantial use to the defendant."  And for

16    intentional or negligent non-disclosure, the only requirement is that it be "of

17    obvious value to the accused" or suppressed "for the sake of obstruction" (*Durgin*).

18    *Polisi*, in fact, provides an instructive parallel.  Anthony Polisi was

19    convicted of armed robbery in connection with a group of coconspirators

20    (including his son, Salvatore); all but the Polisis pled guilty.  "The Government's

1    case against the Polisis relied upon the testimony of three of the four confessed

2    participants... who described Anthony Polisi as the mastermind." But in a

3    subsequent trial against a new alleged coconspirator (Franzese), the three

4    Government cooperators testified again; "this time, however, relegating the

5    appellant Anthony Polisi to a relatively minor role... and instead testifying that

6    leadership belonged to Franzese." This new story was "substantially what

7    Cordero, who had not been called as a witness against the Polisis, had said in

8    statements to the FBI"—statements which the Government "suppress[ed] or

9    fail[ed] to disclose" pre-trial.

10    The Court ruled in *Polisi* that "even assuming that, at the time of trial, the

11    government could well have legitimately concluded that Cordero's testimony was

12    merely cumulative... the evidence suppressed was material and of substantive use

13    to Anthony Polisi" and as such a new trial would still be required. The suppressed

14    evidence "did not conclusively establish any perjury," but "there was a definitely

15    conflict" between it and the trial testimony. As such, "where the conviction is

16    shown to be based even in part upon perjured testimony... a court will not stop to

17    inquire as to the precise effect of the perjury, but will order a new trial if without

18    the perjury the jury might not have convicted."

19    So the Court in *Polisi* ruled that the lowest standard applied—that "a

20    prosecutor's failure to disclose evidence of obvious value to the accused requires a

1    new trial, even when the perjury concerned only the credibility of the witnesses."

2    It furthermore ruled that *Polisi* met the middle standard as well, where the

3    suppressed material was "material and of substantive use to" the defense.

4    **2. Materiality**

5         Like *Polisi*, the suppressed evidence in the instant case would have been

6    "material and of substantive use to" the defense, and thus meets the middle

7    standard.

8         The suppressed evidence in the instant case was in the possession of the

9    Government (including the SBSD officers, per *Kyles v. Whitley*) prior to trial.  For

10   instance, SBSD was clearly within possession of whatever actual statement of

11   probable cause they gave Debra Harris in June 2020, the results of their own

12   Internal Affairs investigation, their own personnel records, and the fate of the

13   evidence they themselves (at the very least) lost track of.

14        And each of the areas of misconduct--The Internal Affairs report, missing

15   cell phones, suppressed confidential informant, suppressed personnel records,

16   missing probable cause, misappropriated narcotics, identification of Mr. Carasco,

17   Louis Vuitton receipts, and purported confession--would have "some substantial

18   use" to the defendant in impeaching "the credibility of the witnesses" at trial,

19   including Dep. Nicassio, the Government's star witness.

1    But unlike in *Polisi*, not only does the suppressed evidence meet this bar—in

2    fact it meets *every* bar.  The lack of affidavit of probable cause, for instance, would

3    invalidate the narcotics for which Mr. Carasco was convicted as evidence at trial.

4    That would not just be 'favorable' and 'material,' it would in fact 'probably

5    produce a different verdict,' thus meeting the general bar for a new trial under Rule

6    33.

7    **3. Obstruction**

8    Not only does the materiality of the evidence in the instant case meet the

9    *highest* bar for a new trial, but—like in *Polisi*--the scope of misconduct qualifies it

10   for the *lowest* one.

11   Given the long track record of Mr. Carasco explicitly requesting this

12   evidence—often repeatedly—from the prosecution pre-trial and their complete and

13   consistent failure to produce it, 'the value of the evidence to the accused' could not

14   have escaped the Government.

15   And it furthermore seems apparent that, at least on the part of Dep. Nicassio

16   and the SBSD officers—the key part of the Government's team—the

17   nondisclosures were 'considered decisions for the sake of obstruction.'

18   The missing statement of probable cause, for example, is clear.  The

19   Government—presumably relying on their arresting officers—submitted, as a

20   'search warrant return' to the 2020 Debra Harris warrant, a bundle of documents

1   including the warrant they requested on June 11th, 2020, and also including a

2   *document they themselves had created* over a year earlier, purporting to be a

3   'statement of probable cause,' and purportedly signed by a different judge in April

4   2019.  Not only would it be obvious how this evidence would be 'valuable to the

5   accused'—there is *no* innocent explanation for the Government's behavior there.

6   It could only have been done 'for the sake of obstruction'—covering up the fact

7   that they had lied about having a search warrant at the time of the search, and that

8   the actual statement of probable cause for the Debra Harris warrant is presumably

9   unrelated to Mr. Carasco.

10       So although the evidence easily clears the bar of being "material and of

11  some substantive use," like in *Polisi*, it need not hit that bar.

12

13  **(IV) Conclusion**

14

15       The Government repeatedly failed to disclose material exculpatory and

16  impeachment evidence to the defense—including the missing affidavit of probable

17  cause; the SBSD officers' personnel files and associated misconduct; the existence

18  of a confidential informant on the Government's payroll; missing cell phones and

19  surveillance footage; planted Louis Vuitton receipts; and false testimony by their

20  key witnesses that was left uncorrected and in some cases actively elicited by the

1    Government.  And while much of this nondisclosure was initiated by the SBSD

2    officers, the prosecution is responsible for their behavior in this case.

3          Many of these individually would be sufficient to undermine confidence in

4    Mr. Carasco's conviction; together they make it hard to image how a new trial

5    could do anything but acquit him.  And if the Government's case cannot survive

6    the gross police misconduct, we request that this Court use its "supervisory powers

7    over the administration of justice… to dismiss an indictment, whenever the pursuit

8    of truth and justice becomes tainted." (*Butler*, citing *La Buy v. Howes Lether Co.,*

9    352 U.S. 249, 259-260, 77 S. Ct. 309, 1 L. Ed 2d 290 1956; *Lego . Twomey,* 404

10   U.S. 477, 479, n.1, 92 S. Ct. 619, 30 L. Ed 2d 618 1972; *United States v. Heath,*

11   260 F.2d 623, 632 9th Cir. 1958; *United States v. Orman,* 417 F. Supp 1126

12   D.Colo. 1976; and *United States v. Banks,* 383 F. Supp 389, 392 D.S.Dak 1974.)

13         As such, a new trial for Mr. Carasco is warranted and the only appropriate

14   remedy for the Government's pattern of undisclosed *Brady* and *Giglio* material.

15

16                                              Respectfully submitted,

17                                              /s/ Jesus Eric Carasco, pro-se

**Certificate of Service**


I, Jesus Eric Carasco, am an inmate at the Metropolitan Detention Center at 80 29th Street in Brooklyn, NY 11232. I am the defendant, pro-se, in the instant case.

I hereby certify that, on December *30*, 2024, I caused filing with the Court the foregoing RESPONSE TO GOVERNMENT'S OPPOSITION TO RULE 33 MOTION AND MOTIONS TO COMPEL *BRADY*; and I placed a sealed envelope for collection and mailing via United States mail to the following:

Ronald Reagan Federal Building and United States Courthouse
411 W 4th Street Suite 8000, Santa Ana, CA 92701
AUSA Nandor Kiss;

and

Ronald Reagan Federal Building and United States Courthouse
411 W 4th Street #1053, Santa Ana, CA 92701
Honorable James V. Selna
Courtroom 10C

This certificate is executed on December *30*, 2024, in Brooklyn, NY. I certify under penalty of perjury that he foregoing is true and correct.

/s/ Jesus Eric Carasco

# Exhibits

# Exhibit A

*ASJ emails*

TRULINCS 26019112 - CARASCO, JESUS ERIC - Unit: BRO-C-A

---------------------------------------------------------------------------------------------------

FROM: 26019112
TO: Julian, Andrea
SUBJECT: RE: RE: Brady Demand 6/3/2024
DATE: 06/12/2024 11:38:52 AM

Hi,

Understood. That being said, while I can send them requests on the basis of the district court actions, you can on the basis of the appellate actions. And so I still think you could send them a similar request. It is relevant to the ongoing appeal; for instance, some of the information contained in these Internal Affairs and Fullerton investigations into SBSD (like the missing probable cause statement for the Debra Harris warrant, the fact that the relevant fact witnesses for the warrants have been fired by SBSD after their actions in my case, and the lack of warrant number for the OnStar warrant) is pertinent to the request for a Franks hearing and what would happen during it, and so it seems important to the appellate process to ask for much of it

Did the Government say that they were not going to respond *because* it was me asking instead of you, or because they were not interested in engaging further on Brady obligations? It seems to me that they *do* have ongoing obligations for Brady material that was potentially material to the outcome of the trial and might have impacted it, and much of this information does in fact meet that post-trial materiality standard under controlling 9th circuit precedent.

Thank you,
Jesse
-----Julian, Andrea on 6/12/2024 6:06 AM wrote:

>

Unfortunately, Jesse, I don't think the government is going to allow you to have it both ways. You represent yourself in the district court. I do not. That being said, even if I did request it, I think they would still choose not to respond.

JESUS ERIC CARASCO on 6/11/2024 7:51:22 PM wrote
Understood. I obviously don't agree with them on that--they should have to respond to me at the district court level.

That being said, if that's the position they're taking, would you be able to send them a requests on the same topic ? In particular, asking them for:

All materials, results, and findings from the SBSD Internal Affairs and TFO Mike Greene/Fullerton investigations into the SBSD officers in my case, including of the fired officers (Nicassio, Smith, and Pollick)?

Thanks,
Jesse
-----Julian, Andrea on 6/11/2024 6:21 PM wrote:

>

I need to clarify my earlier statement. The government is under no obligation to respond to your letters and it has indicated that it will not respond. Apparently, the government does not feel there is anything it needs to say.

JESUS ERIC CARASCO on 6/11/2024 3:50:17 PM wrote
Hi Andrea,

I am confused by something. Can you confirm--is it that they will _not_ respond to me because I'm represented by counsel on appeal, or that they _will_ respond to me directly?

If they will _not_ respond to me directly, that seems like a mistake: I am pro-se in the district court, which is where these demands were targetted, as they refer, among other things, to my ongoing Rule 33 motion and other potential future motions, and they have ongoing Brady obligations in the district court (in addition to the appellate process) that they are not excused from just because trial has ended.

If this sounds right to you, please ask them to respond to me directly; and if they *do* keep resonding to you, please forward their responses to me. If I'm wrong about this, please tell me!

# Exhibit B

*ER 1368, 1442*

Authentic Warrant

**WARRANT NOTES**

(No Notes)

VVSW 20-1275

County of San Bernardino.

The people of the State of California to any peace officer in the County of San Bernardino:

Proof, by affidavit, having been this day made before me by telephone by the officer whose signature is affixed to the affidavit, that there is probable cause for believing that evidence tending to show that a felony (or felonies) has or have been committed, you are therefore commanded to make search on the person and/or property set forth in the description page and/or affidavit, which is incorporated by reference herein; and, in the case of a thing or things or personal property, if you find the same or any part thereof, to bring the thing or things or personal property forthwith before me at the courthouse of this Court.

Given under my hand, and issued at 09:14 on this 11th day of June, 2020

Hobbs Sealing Approved:  NO                    Night Service Approved:    NO

*Harris*

Judge Debra Harris

Warrant ID: 000038580

**END OF WARRANT**

The question now is where the probable cause to this warrant is? What are they searching I have been in custody for 14 months.

Page 3 of 3

CARASCO_000138

ER 1368

10

| | | |
|---|---|---|
| 10:09 | 1 | MR. BARTON: I do not. And I've -- Mr. Ahn is |
| 10:09 | 2 | actively trying to get it. It's the San Bernandino |
| 10:09 | 3 | Sheriff's Department. It's not an agency that he normally |
| 10:09 | 4 | deals with, but he is actively trying to get all the |
| 10:09 | 5 | discovery. It's been very thin. Some of it has been |
| 10:09 | 6 | accidentally erased or destroyed. Some of it has been as a |
| 10:09 | 7 | result of the San Bernandino County Courthouse being closed. |
| 10:09 | 8 | But, no, I don't. Mr. Ahn has a long list of what I need, |
| 10:10 | 9 | and he's actively trying to get it for me. |
| 10:10 | 10 | THE COURT: Without telling me what your views |
| 10:10 | 11 | are, I take it you've assessed the theories with regard to |
| 10:10 | 12 | the San Bernandino -- is it the Sheriff's Department or the |
| 10:10 | 13 | city Police Department? |
| 10:10 | 14 | MR. BARTON: It's the San Bernandino Sheriff's |
| 10:10 | 15 | Department, Your Honor. |
| 10:10 | 16 | THE COURT: They conducted the initial arrest? |
| 10:10 | 17 | MR. BARTON: Yes, they did. And the problem was |
| 10:10 | 18 | that the warrant was issued out of the Victorville |
| 10:10 | 19 | courthouse. When we went to go get it, they told us it |
| 10:10 | 20 | didn't exist. When we went back because we knew it had to |
| 10:10 | 21 | be out of Victorville, the courthouse was closed. And we |
| 10:10 | 22 | found out last week after Mr. Ahn demanded to get it from |
| 10:10 | 23 | them that it was not filed with the court nor was the return |
| 10:11 | 24 | search warrant filed that's required by the ten days. |
| 10:11 | 25 | So that, you know, is an evolving fact of this |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

ER 1442

Case 8:19-cr-00169-JVS   Document 208   Filed 01/06/25   Page 59 of 87   Page ID
#:2231
Case 8:19-cr-00169-JVS   Document 145   Filed 09/06/24   Page 34 of 55   Page ID
#:2106

8/12/2021                                    Mail - Nicassio, Gaetano - Outlook

### Fwd: Warrant Request Received

Pollick, Andrew <apollick@SBCSD.ORG>
Thu 8/12/2021 1:02 PM
To: Nicassio, Gaetano <gnicassio@SBCSD.ORG>

Respectfully,
Deputy Andrew Pollick
San Bernardino County Sheriff's Department Specialized Enforcement Division/ S.W.A.T.
(909) 453-9911

---

**From:** CourtWarrant@sb-court.org <CourtWarrant@sb-court.org>
**Sent:** Thursday, June 11, 2020 9:13:48 AM
**To:** Pollick, Andrew <apollick@SBCSD.ORG>
**Subject:** Warrant Request Received

Your warrant submission has been processed by the server and the on-call judge has been alerted.  You
will receive another notification once the on-call judge accesses the warrant. Warrant ID: 000038580

CARASCO_000233

8/12/2021                                    Mail - Nicassio, Gaetano - Outlook

## Fwd: Warrant Request In Process

Pollick, Andrew <apollick@SBCSD.ORG>
Thu 8/12/2021 1:02 PM
To: Nicassio, Gaetano <gnicassio@SBCSD.ORG>

Respectfully,
Deputy Andrew Pollick
San Bernardino County Sheriff's Department Specialized Enforcement Division/ S.W.A.T.
(909) 453-9911

**From:** CourtWarrant@sb-court.org <CourtWarrant@sb-court.org>
**Sent:** Thursday, June 11, 2020 9:14:42 AM
**To:** Pollick, Andrew <apollick@SBCSD.ORG>
**Subject:** Warrant Request In Process

Your warrant submission has been accessed by the on-call judge. The judge should contact you soon at
the phone number you provided. Warrant ID: 000038580

CARASCO_000234

Case 8:19-cr-00169-JVS    Document 208    Filed 01/06/25    Page 61 of 87    Page ID
#:2233
Case 8:19-cr-00169-JVS    Document 143-2 Filed 09/06/24    Page 36 of 55    Page ID
#:2108

8/12/2021                                          Mail - Nicassio, Gaetano - Outlook

## Fwd: Electronic Warrant

Pollick, Andrew <apollick@SBCSD.ORG>
Thu 8/12/2021 1:02 PM
To: Nicassio, Gaetano <gnicassio@SBCSD.ORG>

Respectfully,
Deputy Andrew Pollick
San Bernardino County Sheriff's Department Specialized Enforcement Division/ S.W.A.T.
(909) 453-9911

**From:** CourtWarrant@sb-court.org <CourtWarrant@sb-court.org>
**Sent:** Thursday, June 11, 2020 9:15:46 AM
**To:** Pollick, Andrew <apollick@SBCSD.ORG>
**Subject:** Electronic Warrant

The warrant you submitted has been completed. You may view the warrant by accessing the Electronic
Warrant Download website. Use the following Download Code:

UMPPPKJFXU

The Download Code will expire on 06/13/2020 at 09:15

CARASCO_000235

Case 8:19-cr-00169-JVS   Document 208   Filed 01/06/25   Page 62 of 87   Page ID
Case 8:19-cr-00169-JVS   Document 1#:2234Filed 09/06/24   Page 37 of 55   Page ID
#:2109

**WARRANT NOTES**

VVSW 20-127⁵

(No Notes)

County of San Bernardino.

The people of the State of California to any peace officer in the County of San Bernardino:

Proof, by affidavit, having been this day made before me by telephone by the officer whose signature is affixed to the affidavit, that there is probable cause for believing that evidence tending to show that a felony (or felonies) has or have been committed, you are therefore commanded to make search on the person and/or property set forth in the description page and/or affidavit, which is incorporated by reference herein; and, in the case of a thing or things or personal property, if you find the same or any part thereof, to bring the thing or things or personal property forthwith before me at the courthouse of this Court.

Given under my hand, and issued at 09:14 on this 11th day of June, 2020

Hobbs Sealing Approved:   **NO**          Night Service Approved:   **NO**

Judge Debra  Harris

**Warrant ID: 000038580**

**END OF WARRANT**

Page 3 of 3

CARASCO_000138

# Exhibit C

*8:22:cv-00755-JVS Dkt 3 at 24-26 (Barton emails on cell phones)*

*7/4/2024 email from Mr. Carasco to prosecution*

Case 8:19-cr-00169-JVS    Document 208    Filed 01/06/25    Page 64 of 87    Page ID
#:2236
Case 8:22-cv-00755-JVS   Document 3   Filed 04/04/22   Page 24 of 42   Page ID #:37

LAW OFFICE OF

# JOHN W. BARTON

23 Corporate Plaza, Suite 150
Newport Beach, California 92660
www.jbartonlaw.com

Tel: (949) 222-1199
Fax: (949) 608-7034
john@jbartonlaw.com

June 2, 2020

Daniel H. Ahn
Assistant United States Attorney
United States Courthouse
411 West Fourth Street
Santa Ana, California 92701

Re: *U.S. v. Carasco*
Case No. SA CR 19-00169-JVS

Dear Mr. Ahn,

On March 23, 2020, the government produced Bates Carasco_1 – 47. On April 23, 2020, the defense demanded additional discovery, including "all discovery requested in the attached discovery demand, including but not limited to all documents, investigative reports, officer notes, and other documents, surveillance videos, recordings regarding this investigation, the name of the Court and Judge that issued the S.W, and the time it was issued. The S.W. states it was issued by the San Bernardino Superior Court High Desert Judicial District. We cannot locate the Judge or Court that issued the warrant. There is no warrant number or file stamp on the S.W. - Bates 38. You have not produced the Return of S.W. Please produce the audio of the recorded interview of the defendant - Bates 8. To date, you have produced only 48 pages of discovery."

In response, on May 5, 2020, you produced Bates Carasco_48 – 97, indicating, "I expect more discovery to come in waves." Except for three pages, every page was a duplicate of Bates Carasco_1 – 47. Almost none of the requested discovery has been produced.

Exhibit E6

Law Office of
John W. Barton

June 2, 2020
Page 2

One month later, on June 1, 2020, I received 30 pages of discovery (no Bates number). In total, I have received approximately 80 pages of non-duplicative discovery.

Please immediately produce:

- Color pictures of the three items described in the property report BS#0006 - Item 1: Poly Mero Inc; Item 2: 9mm pistol magazine Item 3: Documents located in Carasco's residence.
- Pictures of the contents found in the black handbag containing approximately $10,000, and forensic image of the data from the two cell phones taken from Carasco. BS#0007.
- Color photos of BS# 0042-0048. The black and white photos produced are not viewable.
- A copy of Mr. Carasco's digitally recorded interview BS#0008.
- Photographs of all items seized during the search of the apartment, including the Black Polymer 80 Pistol found in the top drawer of a cabinet in the restroom, the unloaded pistol with a magazine inside the drawer, the safe inside the closet of the master bedroom, the contents of the safe including the six sealed bindles which appeared to be "kilos," the two 1 gallon zip-lock bags containing several individually packaged bindles with a white powdery substance inside, the packaging material, the scales and other materials consistent with drug sales, and any documents belonging to Carasco and J.D.T, found inside the kitchen. BS#0008.
- The digital photographs taken and downloaded to a CD. BS#0009-0010.
- The name of the Magistrate and the Court issuing the Order Pursuant to Request for Increase in Bail and Request to Examine the Source of Bail. BS#0025.
- The name of the Magistrate and Court issuing the warrant and the time the warrant was issued. BS#0037-0038.
- The text message and video referenced on page 1 of the 6/1/20 production.
- Page 1 of the 6/1/20 production states that on 03/13/19, "Sgt. Campas broadcasted over the air, he was attempting to catch up to a BMW SUV on Highland Ave. Carrasco ran from the vehicle and was not located, Deputies conducted a search of the vehicle and located a phone belonging to Carrasco, two 9mm fired cartridge casings and a large amount of suspected cocaine." Please produce the forensic image and data from the seized phone, and photocopies of the two 9mm fired cartridge casings and cocaine found in Carasco's vehicle.

Exhibit E7

Case 8:19-cr-00169-JVS    Document 208    Filed 01/06/25    Page 66 of 87    Page ID
#:2238
Case 8:22-cv-00755-JVS    Document 3    Filed 04/04/22    Page 26 of 42    Page ID #:39

Law Office of
## John W. Barton

June 2, 2020
Page 3

- Page 3 and 4 of the 6/1/20 production states that Office Jesus Ramirez interviewed B.H. and B.H.'s mother on 3/13/19. Officer Ramirez's report states these interviews were recorded and that the recordings were placed onto a disc and booked into evidence at the Highland station. Please produce the audio recordings.

- Page 4 of the 6/1/20 production states that B.H. stated that Carrasco sent her a video earlier in the day (on 3/13/19), where he was showing her a lighter after he told her he would burn down his [sic] mother's house. B.H. attempted to locate the video but could not find it. B.H. advised the videos were sent from a program that deletes the videos and pictures after 30 minutes. Please produce the forensic image of Carrasco's phone.

- Page 8 of the 6/1/20 production is a General Request Form for fingerprints of items found in Carrasco's vehicle on 3/13/19. Please produce all reports relating to the examination and identification of any latent prints.

- Page 9 of the 6/1/20 production is a Request for Analysis of the drugs seized. Please produce all lab reports and analysis.

- Page 11 of the 6/1/20 production is an Evidence/Property Report. Please produce all photocopies of these items and a forensic image of the Sim Card.

- All notes of law enforcement involved in the 04/15/19 warrant execution and arrest of the Mr. Carasco.

- All reports regarding any Interstate Nexus Determination of the pistol.

- All ballistic reports and testing of the pistol.

The timely production of these items is requested.

Sincerely,

John W. Barton

John W. Barton

Exhibit E8

 Gmail

Jesse <legalpwcarrasco@gmail.com>

## Re: 19-cr-00169-JVS

**Jesse** <legalpwcarrasco@gmail.com>                                    Tue, Jun 4, 2024 at 6:45 AM
To: nandor.kiss@usdoj.gov

To: AUSA Nandor F.R. Kiss; Email: nandor.kiss@usdoj.gov
411 West 4th Street Suite 8000
Santa Ana, California 92701

Re: 19-cr-00169-JVS

From: Jesus Eric Carasco Pro,Se
Register No: 26019-112
Metropolitan Detention Center
80 29th Street
Brooklyn, NY 11232

I am writing to, once again, alert you to important Brady obligations that the Government has in this case, and demand that the Government meet them. I have strong reason to believe that the Government is failing in many of these obligations. I request the Government to produce all evidence that is favorable to the defense--either to the defendant's guilt or punishment--including that which tends to impeach any government witnesses or arresting officers. I am representing myself pro-se in the district court in United States vs. Carasco (8:19-cr-00169-JVS).

UNANSWERED BRADY REQUESTS

The defense has filed numerous Brady requests this year, none of which the Government has taken action on, as far as I am aware; they are filed as below:

1) Dkt 189: search warrants
2) Dkt 190: results of investigations of SBSD officers
3) Dkt 194: misappropriated evidence and falsified documents

BACKGROUND

San Bernardino Sheriff's Department (SBSD) officers arrested Mr. Carasco; conducted the associated search and seizure; and were the core witnesses called by the Government at trial.

Those SBSD officers committed massive misconduct in this case, including but not limited to:

a) falsified search warrants (see Dkt 184, 188, 189) and forged Judge William Powell's signature (see Dkt 184 at 39, 47)
b) stole narcotics, cash, and luxury items (see Dkt 194)
c) planted evidence of Mr. Carasco and Ms. Tapia at the crime scene (e.g. Louis Vuitton receipts; see Dkt 184 at 4-6)
d) destroyed evidence, including cell phones seized during the raid (see Dkt 194 at 5)
e) perjured themselves at Mr. Carasco's trial (see Dkt 184, 188, 190)

In fact, the SBSD officers' theft is even more brazen than laid out above. The officers had previously robbed Mr. Carasco at gunpoint in 2014, stealing approximately $15,000, half a kilogram of cocaine, and half a pound of MDMA, as has been confirmed by New York Strike Force DEA Agent Scott Knox during a recorded proffer session. Five years later, in this instant case, the same unit once again used their government-issued weapons, titles, and cross-sworn status as federal US marshals to commit a litany of crimes, including misappropriating tens of thousands of dollars worth of evidence. In fact, the amount of cash they pilfered from Mr. Carasco in the car structure during the 2019 arrest was approximately $20,000, far more than the $5,573 that Deputy Daniel Garcia--or whoever actually wrote the Evidence/Property Report-- ever disclosed having found at the scene (Dkt 194 at 23).

RESPONSES REQUIRED

The Government must respond to these Brady requests.

The requested information would potentially undermine the entire case against Mr. Carasco and demonstrate his

innocence of the charges against him, including the entirety of the physical evidence; the testimony of the core Government witnesses at trial; and the evidence purportedly tying Mr. Carasco to the narcotics to begin with.

This is not a fishing expedition: the evidence of the SBSD officers' misconduct is overwhelming. SBSD's internal affairs has already confirmed findings related to much of the misconduct (Dkt 184 at 34-35). The purported Debra Harris warrant has an impossible warrant number "artificially grafted on to a copy of the year-old purported Lisa Rogan warrant so as to attempt to conceal the fact that the purported Lisa Rogan warrant did not originally have a warrant number on it" (Dkt 188 at 11), and the court purportedly issuing the Lisa Rogan warrant has confirmed that "no San Bernardino court clerk's office has the original warrant on file" (Dkt 190 at 5). The OnStar warrant's court, in turn, confirmed that the purported warrant does not even have a warrant number (Dkt 184 at 37) and that "neither [the OnStar nor the Lisa Rogan] warrant was even filed with the Court as required by law" (Dkt 184 at 31). And multiple cell phones seized during the raid and arrest of Mr. Carasco are now nowhere to be found; the officers have never produced the cell phones, their contents, or even chain of custody documents for them despite multiple requests (Dkt 135 at 10), thus destroying evidence that would have identified items misappropriated by the officers and clarified Mr. Carasco's locations, among other Brady and Giglio information (Dkt 194 at 5). And multiple officers have been fired by SBSD for their misconduct in US vs. Carasco, including the primary arresting and testifying officers: Dep. Andrew Pollick #F7810; Lt. Joshua Smith #A7276; and Dep. Gaetano Nicassio #D9599.

As such, the Government must, here, request the findings and results of the Internal Affairs (see Dkt 184 at 34-35) and TFO Mike Greene (see Dkt 190 at 15-18) investigations into the SBSD officers from the relevant agencies, including the officers' conduct in the arrest and trial of Mr. Carasco; valid chain of custody documents for the evidence, including the cell phones; and, for those who have been fired, the reasons for their departure; and that those results and findings be disclosed to the defense and/or the Court.

The Government has a clear duty to request this information from SBSD Internal Affairs and Fullerton Police Department Investigations Bureau, and disclose it to the defense under Kyles v. Whitley, 514 U.S. 419, 437-38 (1995): the obligation to disclose includes evidence "known only to the police investigators and not to the prosecutor," and "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf..., including the police."

The defense has repeatedly asked for this information--both before trial (see e.g. Dkt 190 at 5-7) and after (see e.g. Dkt 189, 190, 194), but has received either no response at all, or promises that are not followed through on (e.g. Dkt 190 at 7, "I will look into this").

The Government's failure to produce this Brady material has had devastating consequences. Mr. Carasco is currently serving a 30-year prison sentence based on evidence seized with nonexistent search warrants, tied to him by receipts planted at the crime scene, sloppily recorded in clearly doctored records, and then introduced at his trial in perjured testimony. This has derailed Mr. Carasco's life, resulting in the loss of years with his family and children; diagnoses of anxiety and depression; and permanent destruction of his reputation. The defense has--here and many times before-- pointed the Government to exactly where it can confirm (or deny) this misconduct: Internal Affairs at SBSD; and TFO Mike Greene's Investigations Bureau at the Fullerton Police Department. In case it makes it more convenient for the Government to honor it's legal obligations, SBSD Internal Affairs' phone number is (909) 387-3726, and the Fullerton Police Department Investigation Bureau's is (714) 738-6763.

Given the repeated failures to fulfill the clear and compelling Brady obligations with respect to the SBSD officers, the defense expects the Government to reach out to SBSD Internal Affairs and TFO Mike Greene and the Fullerton Police Department Investigations Bureau, request fulsome materials and results from the investigations into those officers' conduct with respect to Mr. Carasco, and share the results with the defense, or else explain why it is refusing to do so. If the Government requests and receives such materials but is not allowed to share some parts with the defense, they must request approval from the Court to provide a redacted version to the defense, and submit the entire version to the Court for in-camera review.

If the defense does not receive such a response by June 14th, 2024, we will be forced to re-file motions to compel highlighting the Government's indifference to their legal Brady obligations. I will await your response.

Sincerely,
/s/ Jesus Eric Carasco
June 3rd, 2024
Cc  Attorney Andrea St. Julian
Sent from my iPhone

 Gmail

Jesse <legalpwcarrasco@gmail.com>

**Jesse**
2 messages

**Manuel Medina** <medinajunior1988@icloud.com>                Thu, May 30, 2024 at 8:50 AM
To: Legalpwcarrasco@gmail.com

To: AUSA Nandor F.R. Kiss; Email: nandor.kiss@usdoj.gov
411 West 4th Street Suit 8000
Santa Ana, California 92701

From: Jesus Eric Carasco # 26019-112 Pro,Se
Metropolitan Detention Center
80 29th Street
Brooklyn, NY. 11232

RE: SA CR 19-00169-JVS

Dear Mr. Kiss,

Recently, the defense has become aware that Dep. Andrew Pollick # F7810, the affiant of the purported Lisa Rogan search warrant (Dkt 184 at 13), was terminated from the San Bernardino Sheriff's Department. Lt. Joshua Smith #A7276 and Dep. Gaetano Nicassio #D9599, other officer's on the instant case, was terminated. Furthermore the defense is aware that these officer's were being investigated for their conduct in this instance (see, e.g., the internal affairs response, Dkt 184 at 34-35; and TFO Mike Green's Fax, ( Dkt 190 at 15). These officer's were the government's star witnesses who testified against Mr. Carasco. As such, the defense is requesting to seek disclosure of information related to their departure from the Sheriff's Department and any relation between it and the instant case. The government's Brady obligations clearly extend to materials related to the SBSD officers, SBSD internal affairs, and the Fullerton Police Department Investigations Bureau, and their investigations related Mr. Carasco's case. See e.g. Kyles v. Whitley, 514 U.S 419, 437-38 (1995): the obligation to disclose includes evidence "known only to police investigators and not to the prosecutor," and that "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the governments behalf..., including the police." It is clear that the SBSD officers, SBSD internal affairs, and Fullerton Police Department Investigations Bureau each have sufficient investigation to trigger the Government's Brady obligations. Prosecutors are in a "unique position to obtain information known to other agents of the government" and have obligations to "disclose what [they] do not know but could have learned" (Carriger v. Steward, 132 F. 3d 463, 480 9th ir. 1997) Otherwise California law "restricts [internal affairs] ability to disclose specific details"; they are "limited to providing members of the public with only" certain information (Dkt 184 at 34).
I will await your response.

Cc. Attorney Andrea St. Julian
Sincerely,
/s/ Jesus Carasco
Sent from my iPhone

---

**Jesse** <legalpwcarrasco@gmail.com>                Mon, Jul 8, 2024 at 10:42 AM
To: kessellawfirm@gmail.com

[Quoted text hidden]

# Exhibit D

*Dkt 197 at 6-10, 12-13 (4/23/2020, 6/2/2020, 6/23/2020, 6/25/2020)*

LAW OFFICES OF

# JOHN W. BARTON

23 Corporate Plaza, Suite 150
Newport Beach, California 92660
www.jbartonlaw.com

Tel: (949) 222-1199
Fax: (949) 608-7034
john@jbartonlaw.com

## Discovery Request

To:        AUSA Daniel Ahn

From:      John W. Barton

Case:      *United States v. Carasco*
           SA-CR-19-00169-JVS

Defendant: Jesus Carasco

Date:      April 23, 2020

Under Rule 16 of the Federal Rules of Criminal Procedure, and other statutes and case law, in particular, *Brady*, *Giglio*, and *Jencks* (18 U.S.C. § 3500), please provide:

1.    Notice of all evidence the government intends to use to which the defendant may be entitled to discover under Rule 16. Fed.R.Crim.Pro. 12(d)(2).

2.    All written or recorded statements of Defendant, to whomever and whenever made, and the substance of any oral statement, if not embodied in writing. If the statements are recorded, please provide a transcript and audible copy of each recording. See *United States v. Bailleaux*, 685 F.2d 1105, 1113-14 (9th Cir. 1982).

3.    All agents' rough notes of all statements referred to above. I further request those notes be preserved. See *United States v. Harris*, 543 F.2d 1247, 1250-53 (9th Cir. 1976).

4.    The names, employment and present assignment of all law enforcement personnel involved in the investigation and arrest(s) in this case and reports submitted by them.

5.    For in camera review by the district court, all personnel files of all law enforcement witnesses whom the government intends to call at trial. *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991); *United States v. Cadet*, 727 F.2d 1453 (9th Cir. 1984).

6.    Defendant's arrest and conviction record, if any.

7.    The description of any prior conviction of Defendant, any "prior similar act" or any other evidence covered by Fed. R. Evid. 609 or 404(b) you may seek to introduce at trial and the theory of its admission.

Exhibit E1

LAW OFFICES OF
JOHN W. BARTON

AUSA ANN
APRIL 23, 2020
PAGE 2

8.   Any evidence that someone other than Defendant committed the crimes charged. *Bowen v. Maynard*, 799 F.2d 593 (10th Cir.), cert. denied, 107 S.Ct. 458 (1986), *Jones v. Jago*, 575 F.2d 1164, 1168 (6th Cir. 1978). Please produce all "offense reports and any other written statements dealing with this case." *Sellers v. Estelle*, 651 F.2d 1074, 1077 (5th Cir. 1981).

9.   Any evidence, including any statements by any person, exculpating Defendant, in whole or in part. *United States v. Srulowitz*, 785 F.2d 382, 387-88 (2nd Cir. 1988).

10.   The name of any witnesses who made an arguably favorable statement concerning Defendant or who could not identify him or who was unsure of his identity or participation in the crime charged. *Jackson v. Wainwright*, 390 F.2d 288 (5th Cir. 1968); *Chavis v. North Carolina*, 637 F.2d 213, 223 (4th Cir. 1980); *Jones v. Jago*, 575 F.2d 1164, 1168 (6th Cir. 1978).

11.   Copies of any documents or other exhibits intended to be introduced at trial by the government.

12.   Any scientific analysis conducted in the case including but not limited to fingerprint, fiber, or other forensic tests, and the underlying data in any government test.

13.   The conclusions and findings of any expert witness you intend to call, whether or not he or she has prepared a written report. *United States v. Barrett*, 703 F.2d 1076 (9th Cir. 1983).

14.   Any photographs, photographic arrays, or video surveillance utilized to identify Defendant, and if they are in color, please provide color photocopies.

15.   The Grand Jury transcripts of all testifying government witnesses.

16.   The name and last known address of each prospective government witness. "Witnesses, particularly eyewitnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them." *Gregory v. United States*, 369 F.2d 185, 188 (D.C. Cir. 1966), cited with approval in *United States v. Cadet*, 727 F.2d 1453, 1469 (9th Cir. 1984).

17.   The name and last known address of every witness to the crime or crimes charged (or the overt acts committed in furtherance thereof) who will not be called as a government witness. *United States v. Cadet*, 727 F.2d 1453, 1469 (9th Cir. 1984).

18.   Any identification statements  cards completed by any witnesses.

19.   The complete arrest and conviction record of each prospective government witness, reflecting all information within the possession, custody, or control of the government, both known or which may become known through due diligence, including but not limited to C.I.I. and F.B.I. rap sheets.

Exhibit E2

LAW OFFICES OF

JOHN W. BARTON

AUSA AHN
APRIL 23, 2020
PAGE 3

Please include the docket number and jurisdiction of all prior and pending cases regarding each prospective government witness. See *United States v. Strifler*, 851 F.2d 1197 (9ᵗʰ Cir. 1988).

20. Any evidence that any prospective government witness has ever made any false statement to the authorities, whether or not under oath or under penalty of perjury, or any evidence that such witness does not have a good reputation in the community for honesty. See *United States v. Strifler*, 851 F.2d 1197 (9ᵗʰ Cir. 1988); Rule 608(a), Federal Rules of Evidence.

21. Any evidence that any prospective government witness, has ever made a false, contradictory, or inconsistent statement, or any statement showing bias or a motive to fabricate. *Pennsylvania v. Ritchie*, 107 S.Ct. 989 (1987); *United States v. Strifler*, 851 F.2d 1197, 1202 (9ᵗʰ Cir. 1988).

22. Any evidence that the testimony of any prospective government witness contravenes or contradicted by that of any other person or prospective witness. *Kyles v. Whiteley*, 115 S.Ct. 1555 (1995); *United States v. Hanna*, 55 F.3d 1456 (9ᵗʰ Cir. 1995).

23. All prior written, recorded, or oral statements of each prospective government witness relating to this case to whomever, and agents' rough draft notes of interviews with prospective government witnesses.

24. The name, address, and whereabouts of any cooperating witness or informant who provided information regarding the investigation of this case or whom may have information relevant and helpful to the defense. *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957).

25. All notes or other evidence of any communication between the government and all cooperating witnesses or their counsel—including materials relating to "proffer sessions" that occurred well before the date of any cooperation agreement or other report of those communications. This material includes any variations in witness' proposed testimony, from earlier statements made to authorities, and any information that reveals the nature of the negotiation process that led to any leniency agreement. *United States v. Sudikoff*, 36 F.Supp.2d 1196 C.D.Ca. March 2, 1999) No. CR 97-1176-DDP.

26. Any discussion about or advice concerning any contemplated prosecution of any prospective government witness, or any contemplated plea bargain, even if no bargain was made, or the advice not followed. *Brown v. Dugger*, 831 F.2d 1547, 1555 (11ᵗʰ Cir. 1987) (Clark, J. concurring) (evidence that witness sought plea bargain is to be disclosed, even if no deal struck); *Haber v. Wainwright*, 756 F.2d 1520, 1524 (11ᵗʰ Cir. 1985).

27. Any express or implicit promise, understanding, offer of immunity or of past, present, or future compensation, or any other agreement or understanding between any prospective government witness (federal, state and local). This request includes any explicit or implicit understanding relating to criminal or civil income tax liability. *United States v. Shaffer*, 789 F.2d

Exhibit E 3

Case 8:19-cr-00169-JVS    Document 208    Filed 01/06/25    Page 74 of 87    Page ID
#:2246
Case 8:19-cr-00169-JVS    Document 197    Filed 08/19/24    Page 9 of 23    Page ID
#:2055
Case 8:22-cv-00755-JVS    Document 3    Filed 04/04/22    Page 22 of 42    Page ID #:35

LAW OFFICES OF
JOHN W. BARTON

AUSA AHN
APRIL 23, 2020
PAGE 4

682 (9th Cir. 1986). "The prosecutor is responsible for the nondisclosure of assurances made to his principal witnesses even if unknown to the prosecutor. Since the investigative officers are part of the prosecution, the taint on the trial is no less if they, rather that the prosecutor, were guilty of nondisclosure." *United States v. Butler*, 567 F.2d 885, 891 (9th Cir. 1978) (citation omitted).

28.   Under your obligation under *Brady v. Maryland* and *Giglio v. United States*, please provide the following additional discovery regarding any confidential informant, including the CS-1:

28.1 The name, last known address, and telephone number of the confidential informant or confidential source ("CI").

28.2 The CI's criminal record, including but not limited to reports of law enforcement agencies relating to his prior arrests and/or his participation in criminal activity.

28.3 The CI's prior statements (including handwritten notes) concerning his knowledge of persons engaged in narcotics trafficking that omit any reference to my client.

28.4 Records of payments, expense reimbursements, and all other benefits received by the CI by any federal, state or local government agency for his/her assistance in the investigation and prosecution of the instant case and all other criminal matters. If no such records exist or if existing records do not reflect all payments, expense reimbursements, and benefits, please provide a written summary of those payments, expense reimbursements, and other benefits received by the CI. This request for information regarding benefits received by the CI includes, but is not limited to, oral and written promises for favorable treatment in any past, present, or future criminal prosecution or civil or administrative manner; provision of any goods or services; and/or provisions or promises for more favorable conditions of confinement.

28.5 Contracts, agreements, and letters/memoranda of understanding between the CI and any agency of the United States government or any other state or local law enforcement agency.

28.6 The name, case number, and jurisdiction of all other judicial proceedings in which the CI has been utilized as an informant and/or testified.

28.7 Records of polygraph examinations and/or refusals to submit to polygraph examinations by the CI.

28.8 Records (including handwritten notes) which indicate that the CI has provided untruthful or misleading information or testimony for this case or any other case to any state or federal law enforcement agency, state or federal grand jury, or state or federal court.

28.9 Notice of all wiretaps, searches, and seizures of telephones, persons, or places that occurred during any phase of this case. Please provide the date and location of the wiretaps and

Exhibit E4

Case 8:19-cr-00169-JVS   Document 208   Filed 01/06/25   Page 75 of 87   Page ID #:2247
Case 8:19-cr-00169-JVS   Document 197   Filed 08/19/24   Page 10 of 23   Page ID #:2056
Case 8:22-cv-00755-JVS   Document 3   Filed 04/04/22   Page 23 of 42   Page ID #:36

LAW OFFICES OF
JOHN W. BARTON

AUSA AHN
APRIL 23, 2020
PAGE 5

searches and a list of the items seized. If a warrant or wiretap authorization was obtained, please provide a copy, and any affidavits submitted in support of the application for the warrant or wiretap and any search inventory or warrant returns. Also, provide arrest warrants and accompanying affidavits, if any.

29. Any information that the government intends to use as part of any sentencing procedures, including adjustments and departures.

Regarding the above materials, please inquire of each government agent connected to the case. *United States v. Bailleaux*, 685 F.2d 1105, 1113 (9th Cir. 1982). *Brady* material is in the possession of the government even when held by another agency involved in the investigation. *United States v. Wood*, 57 F.3d 733 (9th Cir. 1995); *United States v. Santiago*, 46 F.3d 885, 893 (9th Cir. 1995). If you decline to disclose any of the above, or if you have doubts as to the propriety of disclosure, the proper course is to submit the materials to the court for its review. *United States v. Lehman*, 756 F.2d 725, 729 (9th Cir. 1985).

Thank you for your early and speedy cooperation. Again, please provide the materials requested above as soon as possible. Please consider this discovery request to be continuing.

Sincerely,

John Barton

John W. Barton

JWB: jt

Exhibit E5

Law Offices of John W. Barton Ivan Carasco   Case 8:22-cv-00755-JVS   Document 3   Filed 04/04/22   Page 29 of 42   Page ID #:42                      https://mail.google.com/mail/u/0?ik=5008db155a&view=pt&sear...

M Gmail                                                    John Barton <jwb@johnbarton.com>

## Carasco

John Barton <john@jbartonlaw.com>                                         Thu, Apr 23, 2020 at 3:39 PM
To: "Ahn, Daniel (USACAC) 1" <daniel.ahn@usdoj.gov>

Daniel,

Please provide me with all discovery requested in the attached discovery demand, including but
not limited to all documents, investigative reports, officer notes, and other documents,
surveillance videos, recordings regarding this investigation, the name of the Court and Judge that
issued the S.W, and the time it was issued. The SW states it was issued by the San Bernardino
Superior Court High Desert Judicial District. We cannot locate the Judge or Court that issued the
warrant. There is no warrant number or file stamp on the SW - Bates 38. You have not produced
the Return of SW. Please produce the audio of the recorded interview of the defendant - Bates 8.
To date, you have produced only 48 pages of discovery. Normally, there would be hundreds of
pages or even thousands of pages of discovery in similar cases. I greatly appreciate your
immediate attention to this matter.

John W. Barton
23 Corporate Plaza, Suite 150
Newport Beach, CA 92660
(949) 222-1199

discovery demand letter.pdf
86K

Exhibit E11

LAW OFFICE OF

# JOHN W. BARTON

23 Corporate Plaza, Suite 150
Newport Beach, California 92660
www.jbartonlaw.com

Tel: (949) 222-1199
Fax: (949) 608-7034
john@jbartonlaw.com

Via Email

June 23, 2020

Daniel H. Ahn
Assistant United States Attorney
United States Courthouse
411 West Fourth Street
Santa Ana, California 92701

Re: *U.S. v. Carasco*
Case No. SA CR 19-00169-JVS

Dear Mr. Ahn,

After receiving minimal discovery from the government (47 pages), on April 23, 2020 I sent a formal discovery demand. On June 2, 7, and 8, I sent detailed supplemental discovery demand letters. To date, I have received only minimal supplemental discovery. The majority of additional documents you produced were merely duplicates of the original discovery. The discovery, investigative reports, and body cam videos I am requesting were from Mr. Carasco's arrest 14 months ago. The production of these documents should be straight forward. Even simple requests like viewable color photos have not been produced. The photos are digitized and can be attached to an email in minutes.

The government's failure to provide the requested discovery forces me to move to compel discovery. Please provide a line item response to my three letters, either producing the items or providing a date when they will be produced and a reason why they cannot be produced at this time. If I do not receive a satisfactory response and meaningful document production by Friday, June 26, 2020, I will be forced to file a motion to compel.

Sincerely,

*John Barton*

John W. Barton

Exhibit E12

Case 8:19-cr-00169-JVS    Document 208    Filed 01/06/25    Page 78 of 87    Page ID
#:2250
Case 8:21-cv-01344-JGB-PVC    Document 7    Filed 11/05/21    Page 64 of 71    Page ID #:129

LAW OFFICE OF
# JOHN W. BARTON

23 Corporate Plaza, Suite 150                                        Tel: (949) 222-1199
Newport Beach, California 92660                                      Fax: (949) 608-7034
www.jbartonlaw.com                                                  john@jbartonlaw.com

June 8, 2020

Daniel H. Ahn
Assistant United States Attorney
United States Courthouse
411 West Fourth Street
Santa Ana, California 92701

Re: *U.S. v. Carasco* Case No. SA CR 19-00169-JVS

Dear Mr. Ahn,

I want to share some thoughts and concerns regarding the investigation conducted by San Bernardino
Sheriff Department in this matter.

## SEARCH WARRANT

My read of the dispatch log is that on April 15, 2019, at 2:50 – 3:55 a.m. Officers Awad, Smith, Duncan
Nicassio, Rose, and Mondragon were dispatched to Carasco's apartment complex. It is my
understanding that they all were involved in the arrest and search. To date, no reports by Awad, Smith,
Duncan, Rose, and Mondragon have been produced.

Nicassio's report indicates he arrived at 4:00 a.m. At 12:45 p.m., the log entry seems to show they were
advised of the WARR(ant). Bates 37 indicates Andrew Pollick signed the Affidavit supporting the
search warrant and statement of probable cause on 4/15/19. P.C. §1526 requires the time to be on the
warrant. It is not. Whether the officers intentionally left off the time the warrant was issued and failed
to file it with the court because it was issued after the arrest and search needs to be investigated.

If the warrant was obtained after 12:00, the officers conducted the searches before the warrant was
issued. Carasco was stopped at 12:00 in the apartment parking lot, Bates 7. Nicassio's report states the
apartment was searched at 12:30, Bates 7. Officer's Garcia's report indicates at 12:50 p.m. he met

Case 8:19-cr-00169-JVS    Document 208    Filed 01/06/25    Page 79 of 87   Page ID
#:2251
Case 8:21-cv-01344-JGB-PVC   Document 7   Filed 11/05/21   Page 65 of 71   Page ID #:130

Law Office of
## John W. Barton

June 8, 2020
Page 2

Officer Nicassio at West Valley and took possession of drugs and money. West Valley is a 45-minute drive from 1818 S. State College Blvd Anaheim. Considering the other discrepancies, any contention the time is a typo is suspect.

Bates 61 states defendant was transported to WVDC was CMPLT (complete) at 14:27. This contrasts with the West Valley booking information (Bates 7). The videos from the required belt cams and vehicle cams will provide relevant evidence. It defies logic that seven officers involved in the arrest and search all either failed to activate their body cams or "accidentally" deleted the video. If they do not exist, particularly considering the mandatory requirement they be made, would be a major concern.

The "accidental" deletion of the defendant's interview is suspicious. The digital audio would be time-stamped and add valuable information to the timeline. SBSD Manual §4.430.15 has explicit directions on handling audio and video recordings. SBSD Manual §2.454.40 prohibits the erasure of audio/video recordings of an event or "proof of a criminal offense." I have no doubt you learned of the deletion last week right before telling me. This is 14 months after the search and arrest. It was incumbent upon Officer Nicassio to immediately inform his supervisor, write a report explaining his actions, and timely (read at the time of the grand jury hearing or before) inform you of the destruction.

The dispatch log appears to indicate they received information the warrant was issued at 12:45 p.m. This would be 5 minutes before Carasco, and the evidence were booked at West Valley. Even using Nicassio's timeline, 12:45 p.m. was after the arrest and search.

### AMOUNT OF MONEY SEIZED AND BOOKED

The reports are contradictory regarding where the money was seized and the amount. Officer Nicassio indicates, "during search of Carasco's vehicle, I located a Black handbag containing approximately $10,000 in U.S. Currency, different denomination." This report was written on 4/16/19 – Bates 7.

Bates 32 indicates on 4/15/19, Officer Garcia at West Valley took possession from Officer Nicassio, among other things, "$5,573 in U.S. Currency" "And a small blue purse the U.S. currency was found."

Case 8:19-cr-00169-JVS    Document 208    Filed 01/06/25    Page 80 of 87    Page ID
#:2252
Case 8:21-cv-01344-JGB-PVC    Document 7    Filed 11/05/21    Page 66 of 71    Page ID #:131

Law Office of
## John W. Barton

June 8, 2020
Page 3

In the Request for Increase Bail, Officer Awad states that during a search warrant of Carasco's
*residence*, a firearm, approximately $10,000 in U.S. currency, approximately 4 kilograms of suspected
heroin and 2 kilograms of suspected cocaine were seized. This Request for Increase Bail was written on
4/15/19 and signed by the Judge at 4:15 p.m. Bates 25.

Nicassio states he seized a "black handbag" containing approximately $10,000 during the search of
Carasco's vehicle. A "small blue purse" and $5,573 are booked into evidence (Bates 32).

A black handbag shrinks into a small blue purse, and the money decreases from approximately $10,000
to $5,573. Nicassio examined and counted the money, as evidenced by his statement that it was
"approximately $10,000" in "different denomination." This is an area of concern. My investigation
indicates one of the requested but not produced color photos will be of the cash. It will be interesting to
see if this picture depicts what is arguable more than $5,573. Further, the handling and documentation
of the money violated the Sheriff's required procedures for accounting and documenting seized
currency.

## USE OF FORCE ON DEFENDANT AT TIME OF ARREST

My initial investigation indicates that when defendant was arrested, he was shot with five bean bags
rounds and beat up. It is my understanding that they hit him with five lethal "drag stabilized bean
bags" rather than the less lethal "fin stabilized bean bags." There is no report and no documentation
by SBSD of shooting him with lethal bean bags and the physical confrontation with Carasco where he
was repeatedly hit in the face by the officers.

Nicassio's report states Carasco was located "inside his vehicle in the parking structure. After a short
foot pursuit, Carasco was taken into custody." The Booking Application states there were no injuries
or use of force. Either my information is incorrect, or the report is falsified. I am in the process of
verifying this information. His booking photo should show some of his injuries. Please produce a copy
of the SBSD booking photos from 4/15/19.

SBSD has a strict policy requiring the documentation of any use of force. SBSD Manual §2.454.25
requires that "any recordings of a pursuit, [and] a use of force incident…shall be retained and kept as

Case 8:19-cr-00169-JVS    Document 208    Filed 01/06/25    Page 81 of 87    Page ID
#:2253
Case 8:21-cv-01344-JGB-PVC    Document 7    Filed 11/05/21    Page 67 of 71    Page ID #:132

Law Office of
## John W. Barton

June 8, 2020
Page 4

evidence." SBSD Manual §3.610 requires a use of force investigation be conducted and a written crime report be prepared in this type of situation. This was not done.

None of my concerns are with the U.S. Attorney's Office or you. I have the utmost respect for the U.S. Attorney's Office and you personally. Several red flags regarding SBSD's investigation have arisen. My concerns may be the result of sloppy investigation and reporting by the SBSD. However, what is clear is that these issues need to be thoroughly investigated.

Sincerely,

*John Barton*

John W. Barton

Case 8:19-cr-00169-JVS    Document 208    Filed 01/06/25    Page 82 of 87    Page ID #:2254
Case 8:19-cr-00169-JVS    Document 197    Filed 08/19/24    Page 12 of 23    Page ID #:2058
Case 8:22-cv-00755-JVS    Document 3    Filed 04/04/22    Page 31 of 42    Page ID #:44



**United States Department of Justice**

## United States Attorney's Office
### Central District of California

AUSA Daniel H. Ahn
Phone: (714) 338-3539
E-mail: daniel.ahn@usdoj.gov

Ronald Reagan Federal Bldg. & U.S. Courthouse
411 West Fourth Street, Suite 8000
Santa Ana, California 92701

June 25, 2020

**VIA E-MAIL**

John W. Barton
Law Offices of John W. Barton
23 Corporate Plaza, Suite 150
Newport Beach, California 92660
john@bartonlaw.com

Re:    United States v. Jesus Carasco,
       No. SA CR 19-169-JVS

Dear John:

I write in response to your four discovery letters, addressing each letter in turn, and each item one-by-one.

April 23, 2020 Letter

1.  The government has produced such evidence and is in the process of producing additional such evidence.

2.  The government has produced such evidence. In addition, the government is in the process of obtaining audio relating to the use of force, and should be in a position to produce that audio shortly.

3.  We will produce any such notes that exist.

4.  This information is found in the produced reports, as well as reports that are forthcoming.

5.  We have complied and will continue to comply with our Henthorn obligations. If need be, we will submit files to the court for in camera inspection.

6.  These have been produced.

7.  Such evidence is found in the produced materials. In addition, we expect to produce additional materials that may constitute inextricably intertwined or 404(b) evidence.

8.  I am not aware of such evidence but will provide it if found.

9.  I am not aware of such evidence but will provide it if found.

10. I am not aware of such evidence but will provide it if found.



June 25, 2020
Page 2

11. Such information is in the produced discovery and in the possession of the FBI. We may also use other evidence yet to be produced as we continue to comply with our discovery obligations.

12. Such evidence will be produced shortly.

13. We will comply with our expert disclosure responsibilities.

14. Such evidence has been produced, and additional such evidence will be produced shortly.

15. We will comply with our Jencks obligations.

16. Potential witnesses are identified in the discovery, as well as forthcoming discovery.

17. Potential witnesses are identified in the discovery, as well as forthcoming discovery.

18. We are working to see whether any such evidence exists.

19. We will comply with our Giglio obligations.

20. We will comply with our Giglio obligations.

21. We will comply with our Giglio obligations.

22. We will comply with our Giglio obligations.

23. Such materials has been produced and additional such material will be produced shortly.

24. Such individual(s) has/have been identified in the discovery.

25. We are not aware of such evidence beyond what is referenced in the produced discovery.

26. We are not aware of such evidence.

27. We are not aware of such evidence.

28. We are not aware of any informants being used in this case against defendant.

29. Such information is reflected in the discovery, and in such additional discovery that is forthcoming.

June 2, 2020 Letter

1. We believe that we have produced all colored pictures in our possession. If you'd like to view the evidence in person, please let me know.

2. We believe that we have produced all pictures that were taken. No search was conducted on, or forensic image was taken of, the phones.

3. We believe that we have produced all colored pictures in our possession. If you'd like to view the evidence in person, please let me know.

4. The recording was inadvertently deleted.

5. We believe that we have produced all photographs in our possession. If you'd like to view the evidence in person, please let me know.

6. We believe that we have produced all colored pictures in our possession. If you'd like to view the evidence in person, please let me know.

Exhibit E 14

June 25, 2020
Page 3

7. We expect to produce additional discovery shortly that will include the requested information.

8. I believe that the judge was the Honorable Lisa Rogan, Victorville Superior Court. We are checking whether there is documentary evidence establishing the time that the warrant was issued.

9. We are checking to see whether we have or are able to obtain the requested material.

10. We expect to produce additional discovery shortly that will be responsive to this request.

11. We expect to produce additional discovery shortly that will be responsive to this request.

12. We did not search or forensically image defendant's phone.

13. We will produce this information shortly.

14. We expect to produce additional discovery shortly that will be responsive to this request.

15. We expect to produce additional discovery shortly that will be responsive to this request; however, I understand that defendant's phone was not searched or forensically imaged.

16. We expect to produce such information shortly.

17. No interstate-nexus analysis was conducted on the gun.

18. We plan to conduct a test of the gun and will produce the resulting report when it is completed.

June 7, 2020 Letter

1. We are currently checking whether there is any documentary evidence reflecting the time of the warrant's issuance.

2. There is no body-worn camera footage, as I understand that that is not a requirement of the SWAT team that conducted the operation. We do, however, expect to receive audio relating to the use of force, and will produce that recording once received.

3. Josh Smith was the supervisor who reviewed the warrant.

4. Not applicable, as the SWAT team itself conducted the operation.

5. The supervisor was Josh Smith.

6. We are checking whether a copy of the operation plan is available.

7. We are checking whether such notes exist.

8. Not applicable, per the response to item 4.

9. We have produced discovery responsive to this request, and will continue to produce discovery consistent with our discovery obligations.

10. The supplemental reports you note will be produced shortly.



Case 8:19-cr-00169-JVS    Document 208    Filed 01/06/25    Page 85 of 87    Page ID
#:2257
Case 8:19-cr-00169-JVS    Document 197    Filed 08/19/24    Page 15 of 23    Page ID
#:2061
Case 8:22-cv-00755-JVS    Document 3    Filed 04/04/22    Page 34 of 42    Page ID #:47

June 25, 2020
Page 4

June 8, 2020 Letter

Please note that we will be producing supplemental reports shortly. We will also be producing information relating to the use of force, as well as photographs.

*  *  *

Please let me know if you have any questions, or would like to further discuss any of the matters raised above.

Very truly yours,

/s/ Daniel H. Ahn

DANIEL H. AHN
Assistant United States Attorney

Exhibit E 16

Jesus Eric Carasco Pro se
Reg # 26019 - 112
Metropolitan Detention center
80. 29Th. Street
Brooklyn N.Y. 11232


proc

RECEIVED
CLERK, U.S. DISTRICT COURT

JAN 6 2025

CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION     BY: DEPUTY

To: Honorable James V. Selna
Ronald Reagan Federal Building and
United States Court House
411 West 4th Street # 1053
SANTA ANA, CA. 92701

METROPOLITAN DETENTION CENTER
80 29TH ST, BROOKLYN, NY 11232



METROPOLITAN DETENTION CENTER
80 29TH ST. BROOKLYN, NY 11232
The enclosed letter was processed through
special mailing procedures for forwarding to you.
The letter has neither been opened nor inspected.
If the writer raises a question or problem over which
this facility has jurisdiction, you may wish to return
the material for further information.
If the writer encloses correspondence
for forwarding to another address, please return the
enclosure to the above address.